BOERSCH & ILLOVSKY LLP
Martha Boersch (State Bar No. 126569)
martha@boersch-illovsky.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorneys for Defendant
AMIR BAKHTIARI

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-cr-009-WHA |
| Plaintiff, | **DEFENDANT AMIR BAKHTIARI'S SENTENCING MEMOMORANDUM AND MOTION FOR A DOWNWARD VARIANCE UNDER SECTION 3553** |
| v. | |
| AMIR BAKHTIARI, *et al.* | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................1

    I.      Mr. Bakhtiari's Personal History .....................................................................1

    II.     Character ........................................................................................................3

    III.    Medical Condition .........................................................................................3

    IV.    Mr. Bakhtiari's Immigration Status ...............................................................4

ARGUMENT .........................................................................................................................4

    I.      General Sentencing Principles Justify the Requested Sentence .........................4

    II.     Factors That Justify The Requested Sentence ..................................................5

        A.      Because Mr. Bakhtiari is Deportable to Iran, the Recommended Sentence Creates Unwarranted Sentencing Disparities...........................................................6

        B.      Mr. Bakhtiari's Family Circumstances .........................................................9

        C.      A Longer Term of Imprisonment is Not Necessary in This Case to Achieve Specific or General Deterrence .......................................................................10

        D.      Mr. Bakhtiari has an Exceptionally Low Risk of Recidivism .....................11

        E.      Mr. Bakhtiari's Medical Condition...............................................................12

    III.    Objections to Restitution Amounts ................................................................12

CONCLUSION.....................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Biggs v. Terhune,*
    334 F.3d 910 (9th Cir. 2003) ..................................................................................7

*Hayward v. Marshall,*
    603 F.3d 546 (9th Cir. 2010) ..................................................................................7

*Kimbrough v. United States,*
    522 U.S. 85 (2007)..................................................................................................4

*Pepper v. United States,*
    562 U.S. 488 (2011)................................................................................................4

Peter Sonnen and Sonnen Motorcars LLC v. Amir Bakhtiari, *et al.,*
    No. CIV1801113 (Superior Court of California, Marin) ........................................3

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
    442 F.3d 741 (9th Cir. 2006) ..................................................................................7

*Rosales-Martinez v. Palmer,*
    753 F.3d 890 (9th Cir. 2014) ..................................................................................7

*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.,*
    971 F.2d 244 (9th Cir. 1992) ..................................................................................7

*United States v. Aguirre,*
    214 F.3d 1122 (9th Cir. 2000) ................................................................................9

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) ..................................................................................4

*United States v. Edwards,*
    595 F.3d 1004 (9th Cir. 2010) ................................................................................6

*United States v. Harris,*
    679 F.3d 1179 (9th Cir. 2012) ................................................................................4

*United States v. Hussain,*
    No. 3:16-cr-00462-CRB (CA N.D.) ........................................................................7

*United States v. Lagos,*
    138 S.Ct. 1684 (2018)...........................................................................................12

*United States v. Menyweather,*
    447 F.3d 625 (9th Cir. 2006) ..................................................................................9

*United States v. Smith,*
   683 F.2d 1236 (9th Cir. 1982) ..................................................................................6

*United States v. Waknine,*
   543 F.3d 546 (9th Cir. 2008) ..................................................................................12

*United States v. Whitehead*,
   532 F.3d 991 (9th Cir. 2008) ...................................................................................9

**Statutes and Rules**

18 U.S.C. § 3524 .............................................................................................................8

18 U.S.C. § 3553(a) ...................................................................................................passim

18 U.S.C. § 3624 .............................................................................................................7

18 U.S.C. § 3664 ...........................................................................................................12

28 U.S.C. § 994 ...............................................................................................................4

Fed. R. Evid. 201 ............................................................................................................7

**Other Authorities**

About Our Facilities, Federal Bureau of Prisons,
   https://www.bop.gov/about/facilities/federal_prisons.jsp ....................................6

Bureau of Prisons Program Statement 5100.08 .............................................................6

Bureau of Prisons Program Statement No. 7310.04 (December 16, 1998) ....................8

Federal Bureau of Prisons, Statistics, http://www.bop.gov/about/statistics/population_statistics.jsp .....4

Iran Travel Advisory, U.S. Department of State - Bureau of Consular Affairs,
   https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Iran.html ....................................................................6

Jorjani, R., *Detention, Deportation, and the Immigration Consequences of Criminal Convictions:  An Overview*, Iranian American Bar Association (October 2008) ..........................8

Katherine M. Jamieson and Timothy Flanagan, eds., *Sourcebook of Criminal Justice Statistics – 1988* .....4

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004)....................................................................................11

Pew Charitable Trust Issue Brief, *Prison Time Surges for Federal Inmates* (November 18, 2015)........5

Pew Charitable Trusts, "*Collateral Costs: Incarceration's Effect On Economic Mobility*" (2010) ......9

Pew Report (Feb. 28, 2008), *One in One Hundred:  Behind Bars in America 2008*..........................4, 5

Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995).........................................................................11

Shapour Bakhtiar, Wikipedia, https://en.wikipedia.org/wiki/Shapour_Bakhtiar ...................................2

Shiraz, Wikipedia, https://en.wikipedia.org/wiki/Shiraz ......................................................................1

Shirley R. Klein *et al., Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95 (2002) ..............................................................................................................11

United States Sentencing Commission, Staff Discussion Paper, *Sentencing Options Under the Guidelines* (1996)..................................................................................................................11

Valerie Wright, Ph.D., *Deterrence in Criminal Justice:  Evaluating Certainty v. Severity of Punishment, The Sentencing Project* (November 2010)............................................................10, 11

War of the Cities, Wikipedia, https://en.wikipedia.org/wiki/War_of_the_Cities...................................2

Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington Law Review 1103 (2013) .......6

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resolution 421 (2007)...................................................10

Defendant Amir Bakhtiari hereby submits this Sentencing memorandum for the Court's consideration.

**INTRODUCTION**

Mr. Bakhtiari is a first-time offender with no criminal history.  A citizen of Iran, he is married to Joscelyne Alkus and they have two small boys, ages 7 and 4.  Because of Mr. Bakhtiari's immigration status, he faces not just punishment for his offense, but a "life-altering situation that may destroy his family."  *See* Afsaneh Bakhtiari Letter.  As an alien deportable to Iran, he will be subject to a much harsher penalty than an American citizen in his position would be for a similar offense and with an equivalent guideline calculation.  Because he is an alien, he will be classified as at least "low" security and will not be eligible to be housed at a "minimum-security" camp facility.  He will thus experience considerably harsher conditions of confinement than those experienced by other American "white collar" offenders.  Indeed, he is likely  to  be housed at a private contract prison, where conditions are harsher than at a regular federal  prison of the same security classification.  He will also suffer an additional, indeterminate, period of incarceration in an ICE detention center following completion of any federal prison sentence.  Finally, his status as an alien disqualifies him from end-of-sentence reentry programs that are available to American inmates to shorten  their terms of incarceration.

For all these reasons, described in detail below, any period of incarceration required of Mr. Bakhtiari will be considerably more restrictive, more dangerous, more arduous, and longer, than that of an American "white collar" offender  with an equivalent sentence.  To account for the sentencing disparity created by Mr. Bakhtiari's immigration status, and for other reasons discussed below, Mr. Bakhtiari respectfully requests a downward variance from the recommended sentence and asks the Court to sentence Mr. Bakhtiari to no more than 36 months.

**BACKGROUND**

**I.    Mr. Bakhtiari's Personal History**

Mr. Bakhtiari was born in Tehran, Iran in 1967, and he lived there until 1991.  Presentence Report ("PSR") ¶ 50.  He spent his childhood in Shiraz, Iran, one of the oldest cities of ancient Persia.  Id. ¶ 52; *see also* https://en.wikipedia.org/wiki/Shiraz.  He grew up during the Iraq-Iran war,

which began in 1980 after the 1979 Iranian Revolution.  PSR ¶ 52, *id.*  In 1984-1988, Shiraz was one of five cities targeted by Saddam Hussain in what became known as the War of the Cities.  *See* https://en.wikipedia.org/wiki/War_of_the_Cities.[1]  Mr. Bakhtiari remembers bombs going off regularly in his youth.  PSR ¶ 52.

Mr. Bakhtiari graduated from high school in Iran.  When Mr. Bakhtiari was 18 years old, he entered Iran's obligatory military service for two years.  He also attended the Homa (Iran Air) Aviation School and earned an Avionic Mechanic degree in 1985 and 1989.  *Id.* ¶ 58.

Mr. Bakhtiari immigrated to the United States in 1991, several years after the fall of the Shah of Iran, Reza Pahlavi, and the start of the Khomeini regime.  After the revolution in 1979, Mr. Bakhtiari remembers the Revolutionary Guard coming to his house when he was about ten years old, with guns drawn, searching for his father.  His father had worked as Head of Security for the Iranian oil company under the Shah, and his uncle, Shapour Bakhtiari, had been appointed as the Prime Minister.  Mr. Bakhtiari's father had fled Iran for London after the revolution but returned to Iran after a year.  Mr. Bakhtiari's uncle Shapour Bakhtiari had fled to France where he had been granted political asylum, but he was assassinated in there in 1991, presumably by the Revolutionary Guard. *See* https://en.wikipedia.org/wiki/Shapour_Bakhtiar.

In 1991, Mr. Bakhtiari and his family fled Iran for the United States.  His mother, father, and three of his five siblings live in the United States.  PSR ¶¶ 50, 51.  In 1992, shortly after immigrating to the United States, Mr. Bakhtiari started working as a car salesman at Serramonte Ford in Colma, California.  PSR ¶ 63.  He has worked in the car industry since then and started at Sonnen Audi and Volkswagen in 2009.  *Id.* ¶ 61.

Mr. Bakhtiari has now lived in the United States many more years than he lived in Iran.  In 2017, Mr. Bakhtiari married Joscelyne Alkus, with whom he already had two children:  Bentley (now age 7) and Andrew (now age 4).  His wife and children are United States citizens.  Mr. Bakhtiari is an incredibly devoted father and is devastated by the thought that he could be permanently separated

---

[1]  "The conflict has been compared to World War I in terms of the tactics used, including large-scale trench warfare with barbed wire stretched across fortified defensive lines, manned machine gun posts, bayonet charges, Iranian 'human wave' attacks, extensive use of chemical weapons by Iraq, and, later, deliberate attacks on civilian targets."  *Id.*

from his children.  PSR ¶ 53.  His youngest son is so attached to him that he follows him if he gets up in the middle of the night.  *Id*.  Mr. Bakhtiari's absence from his children will "have a profound and irreversible negative impact on the most innocent in Mr. Bakhtiari's life, his two young children."  *See* Jamshid Shivaie Letter.

Ms. Alkus is a stay-at-home mother and financially unable to support the family.  PSR ¶ 53.  Mr. Bakhtiari was terminated by Sonnen Audi in 2016 and he too has been unemployed since these charges were brought.  PSR ¶ 52.  Shortly after the indictment was filed in this criminal case, Peter Sonnen sued Mr. Bakhtiari, his wife, and a number of other individuals in state court based largely on the allegations here and seeking treble damages.  *See* Peter Sonnen and Sonnen Motorcars LLC v. Amir Bakhtiari, *et al.*, Case No. CIV1801113 (Superior Court of California, Marin).

## II.    Character

Mr. Bakhtiari is described by those close to him as a man of great generosity.  He never hesitated to provide friends and family members with financial support in times of need.  *See* Afsaneh Bakhtiari Letter; Jamshid Shivaie Letter.  His good friend, Hamid Ghazvini, states that Mr. Bakhtiari is a caring person who built his life from scratch and helped many others along the way.  *See* Hamid Ghazvini Letter.  Ms. Ansari knows as him as "a good friend, father, husband, hard worker, and a great contributor to the community."  Dana Ansari Letter.

Mr. Bakhtiari has pled guilty and, as he and those close to him have made clear for the Court, he has accepted responsibility for his criminal conduct.  He is "[w]ithout a doubt . . .incredibly remorseful" and "takes full responsibility and accountability for his actions."  *See* Hamid Ghazvini Letter.  He fully realizes the wrongfulness of his conduct and his responsibility for the harm caused to others.

## III.    Medical Condition

Mr. Bakhtiari suffers from several medical issues and is on a number of medications.  PSR ¶ 56.  He has been granted disability by the Social Security Administration as a result of a diagnosis of early onset Dementia and Alzheimers.  *Id.*; Exhibit A.  His driver's license has been suspended for the same reasons.  Exhibit B.

///

**IV.    Mr. Bakhtiari's Immigration Status**

Mr. Bakhtiari currently holds a work permit valid through July 2020.  Exhibit C.  He has a pending an application for a permanent resident work permit.  Exhibit D.

## ARGUMENT

**I.    General Sentencing Principles Justify the Requested Sentence**

Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994.  In addition, the district courts "*shall* impose a sentence sufficient, *but not greater than necessary,* to comply with [the purposes of sentencing]" 18 U.S.C. § 3553(a); *Pepper v. United States,* 562 U.S. 488 (2011) (sentencing judge's "overarching duty under § 3553(a) is to impose a sentence sufficient, but not greater than necessary"); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (same).  In other words, the punishment must "fit the offender and not merely the crime."  *Pepper*, 562 U.S. at 487-88.  Sentencing, therefore, is "an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has committed a particular crime."  *United States v. Harris*, 679 F.3d 1179 (9th Cir. 2012).  And the sentencing guidelines are not only merely advisory, but also are to be given no more weight than any other factor under Section 3553.  *Carty,* 520 F.3d at 991 (citing *Kimbrough v. United States*, 522 U.S. 85 (2007)).

Despite these guiding principles, "the United States incarcerates more people than any country in the world, including the far more populous China. . . .  America is also the global leader in the rate at which it incarcerates its citizenry, outpacing nations like South Africa and Iran."  Pew Report (Feb. 28, 2008), *One in One Hundred:  Behind Bars in America 2008*, at 5.[2]  The federal prison population is currently more than four and half times what it was when the Sentencing Guidelines were enacted: in 1986, the total federal prison population was 44,408, and today it is over 177,000.  *See* Federal Bureau of Prisons, Statistics, http://www.bop.gov/about/statistics/population_statistics.jsp.; Katherine M. Jamieson and Timothy Flanagan, eds., *Sourcebook of Criminal Justice Statistics – 1988*, Table

---

[2]  Available at http://www.pewtrusts.org/en/research-and-analysis/reports/2008/02/28/one-in-100-behind-bars-in-america-2008)

6.34.

It's not only the number of people incarcerated that has increased dramatically, but also the length of time that people are imprisoned.  *See* Pew Charitable Trust Issue Brief, *Prison Time Surges for Federal Inmates* (November 18, 2015) (length of time served by federal prisoners for all offenses more than doubled between 1988 and 2012; for property crimes it increased by 38%).[3]  While the cost to government has ballooned as a result, America's reliance on incarceration "for many low-risk offenders inflicts economic hardship in many, less obvious ways.  If they have a job at all, prisoners are typically unable to earn more than a very low wage, making it unlikely they will pay much, if anything, in child support, victim restitution, or taxes." Pew Report, *supra,* at 13.

## II.     Factors That Justify The Requested Sentence

This Court is well aware of the factors it must consider under 18 U.S.C. § 3553.  In Mr. Bakhtiari's case, each of the sentences recommended by the Probation Office (60 months) and by the sentencing guidelines (70-87 months) is greater than necessary to comply with the purposes of sentencing and, because of Mr. Bakhtiari's immigration status, will lead to unwarranted sentencing disparities.  Because Mr. Bakhtiari is a deportable alien, he will be subjected to much longer, harsher and more dangerous conditions of incarceration than a comparable America citizen defendant, thus creating a sentencing disparity.  Because he is an Iranian citizen subject to deportation, his conviction alone, quite apart from any sentence of imprisonment, will separate him from his family, including his two young boys, for years and perhaps forever.  As for specific deterrence, as a 51-year-old he poses a very low risk of recidivism.  More pertinently, a longer prison sentence will not achieve specific deterrence because Mr. Bakhtiari is deportable and for that reason alone presents no risk of committing further violations of U.S. law.  As for general deterrence, it is debatable whether longer prison sentences effectively achieve general deterrence.  Finally, Mr. Bakhtiari's medical condition is unlikely to be adequately treated in the prison facilities designated for aliens.

///

///

---

[3]  Available at https://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2015/11/prison-time-surges-for-federal-inmates.

**A.** **Because Mr. Bakhtiari is Deportable to Iran, the Recommended Sentence Creates Unwarranted Sentencing Disparities**

For Mr. Bakhtiari, as for many first-time offenders, the conviction alone and the collateral consequences of the conviction are enormous, making a lengthy prison term to reflect the seriousness of the offense largely unnecessary. *See United States v. Edwards,* 595 F.3d 1004, 1016 (9th Cir. 2010) (district court did not abuse its discretion by noting that the fact of a felony conviction was sufficient to deter future criminal conduct); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive"); *see also,* Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

But because Mr. Bakhtiari is a deportable alien, his conviction – irrespective of any term of imprisonment – creates even more onerous collateral consequences. He will be deportable to Iran and will thus face permanent separation from his wife and children, who are American citizens, who have lived their whole lives in the United States, who do not speak Farsi and who at present are warned by the United States Department of State not to travel to Iran due to the risk of kidnappings, arrest and detentions of U.S. citizens. *See* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Iran.html. This alone is an extraordinarily harsh penalty that is not faced by other similarly situated defendants.

In addition to the consequences of the conviction alone, any term of imprisonment Mr. Bakhtiari receives will subject him to a longer and harsher sentence than an American white-collar offender with the same sentencing guideline range and subject to the same term of imprisonment. But for his immigration status, Mr. Bakhtiari's security level would entitle him to designation by BOP to a minimum security camp.[4] His immigration status, however, makes him ineligible for a minimum security camp. *See* Bureau of Prisons ("BOP") Program Statement 5100.08 ("an inmate who is not a citizen of the United States . . . shall be housed in *at least* a Low security level

---

[4] Mr. Bakhtiari's security level can be estimated using BP-A337.051 (Inmate Load and Security Designation Form). Using that form, his total points would be approximately 5, qualifying him for a minimum security facility, but for his immigration status. *See* BOP, Program Statement 5100.08 (9/12/06), at 12, Table 5-2.

institution" (emphasis added)).  Low security institutions are Federal Correctional Institutions ("FCIs"), not Federal Prison Camps, such as Taft or Lompoc.  *See* https://www.bop.gov/about/facilities/federal_prisons.jsp.  Camps consist of dormitory housing, relatively low staff to inmate ratios, limited or no perimeter fencing and they are work and program oriented.  *Id.*  FCIs, on the other hand, have double-fenced perimeters, dormitory or cubicle housing, and higher staff to inmate ratios.  *Id*.

The differences between a camp and a low-security FCI are significant.  The conditions of confinement at an FCI as opposed to a camp are much harsher, with inmate movements controlled and restricted, physical barriers, armed guard towers, and guards with nonlethal and lethal weapons. *See United States v. Hussain,* No. 3:16-cr-00462-CRB, Dkt. 587-1 (Declaration of Joel A. Sickler in Support of Sushovan Hussain Sentencing Memorandum, ¶ 8).[5]  FCIs are larger and often significantly overcrowded.  *Id.* ¶ 9.  The inmate population of an FCI consists of many more violent offenders than a camp and the rate of violent incidents is much higher.  *Id.* ¶ 13.  Alternatively, because of Mr. Bakhtiari's immigration status, he may be designated by BOP to one of its private prisons.  *Id*. ¶ 16.  These facilities are even worse than FCIs in terms of the number of violent offenders and harsh conditions.  *Id.*

Furthermore, as a non-citizen, Mr. Bakhtiari will be ineligible for transitional programs offered to US citizen inmates.  As a result, he will be held in harsher conditions of confinement for a

---

[5]  Mr. Bakhtiari requests that the Court take judicial notice of this document, also attached here as Exhibit E. Rule 201 of the Federal Rules of Evidence permits the Court to take judicial notice of facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice is an appropriate mechanism for supplementing the record, and may be taken at any stage in the proceeding. Fed. R. Evid. 201(d); *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014). Documents filed in other cases may be judicially noticed by the Court.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (Court "may take judicial notice of court filings and other matters of public record."); *Rosales-Martinez*, 753 F.3d at 894 ("It is well established that we may take judicial notice of judicial proceedings in other courts."); *Biggs v. Terhune,* 334 F.3d 910, 915 n.3 (9th Cir. 2003), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010), ("Materials from a proceeding in another tribunal are appropriate for judicial notice"); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." (quotation marks and citation omitted)).

BAKHTIARI SENTENCING MEMO
                                                                  Case No.: 18-cr-009-WHA

longer period of time than a similarly situated U.S. citizen defendant.  An American offender in Mr.

Bakhtiari's position would be eligible for early release to one of the BOP's Residential Re-Entry

Centers ("RRCs"), normally between 6 and 12 months before his release date.  18 U.S.C. § 3624

(c)(1).  An American offender would also be eligible for early release to home detention 6 months

before his scheduled release date.  18 U.S.C. § 3524(c)(2).  Because he is not a U.S. citizen, Mr.

Bakhtiari will be ineligible for such early release.  *See* BOP Program Statement No. 7310.04

(December 16, 1998) at 10, ¶ 10.c ("Inmates who are assigned a 'Deportable Alien Public Safety

Factor" are ineligible for early release programs).

Finally, at the end of his term of imprisonment, Mr. Bakhtiari will be transferred to

immigration custody, where he may endure an indeterminate time in custody awaiting deportation.  A

U.S. Immigration and Customs Enforcement ("ICE") detainer will be placed on Mr. Bakhtiari to

prevent his release from confinement.  Upon his release date he will be transferred to ICE custody as

a "detainee" and transferred to, most likely, a county jail.  At that point he can be held for an

indeterminate period of time awaiting deportation.  Since he is a citizen of Iran, it is unclear how long

that process may take.  *See* Jorjani, R., *Detention, Deportation, and the Immigration Consequences of

Criminal Convictions:  An Overview*, Iranian American Bar Association (October 2008) at 5

("Removing individuals from the United States to countries with little or no diplomatic relations with

the United States – including Iran – can be a long process, often leading to prolonged or indefinite

detention").[6]

For these reasons, sentencing Mr. Bakhtiari to a guideline sentence, or to a sentence that

would otherwise be imposed upon a U.S. citizen, creates an unwarranted sentencing disparity that

Congress has instructed the courts to avoid.  An American offender facing a 60 month sentence could

be released from custody after 38 months of imprisonment, given the potential for about 10 months of

good time credit and early release to an RRC or home detention of up to 12 months.  Mr. Bakhtiari,

however, will face the full 60 months in custody under harsher circumstances, plus an additional

---

[6]  Available at https://www.iaba.us/wp-content/uploads/2011/11/Working-Document-2-Detention-Deportation-and-the-Immigration-Consequences-of-Criminal-Convictions-An-Overview.pdf.

indeterminate amount of time in ICE custody and then deportation to Iran and permanent separation from his family.

### B.       Mr. Bakhtiari's Family Circumstances

Mr. Bakhtiari's family circumstances, particularly because he is deportable, are grounds for a variance from the recommended guideline range.  Many courts have recognized that the collateral effects of a defendant's incarceration on his family member can and should be considered when imposing sentence.  *See, e.g., United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (for defendant convicted of supplying counterfeit access cards with a loss of $1 million dollars and a guideline range of 41-51 months, court's sentence of probation with 1000 hours of community service and restitution was not abuse of discretion where, among other factors, defendant's eight-year-old daughter depended on him and he doted on her); *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) (sentence of 30 months in tax fraud case vacated in part because the district court rejected defendant's argument that family circumstances justified a below guideline sentence:  "The [district] court's observation that Schroeder's criminal conduct was the cause of the alleged hardship to his daughter is an obvious and not dispositive one, since the culpability of a defendant who appears for sentencing is a given. When a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members"); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (in $500,000 embezzlement case, no abuse of discretion for district court to depart 8 levels to probation in part because of unusual family circumstances where "Defendant's relationship with her daughter, and the care that Defendant provides, are unusual as compared with the situation of other single parents."); *United States v. Aguirre,* 214 F.3d 1122, 1127 (9th Cir. 2000) (within district court's discretion to depart downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who's lost a father and would be losing a mother for a substantial period of time")

That collateral effects on the families is an important factor courts should consider is confirmed by research.  *See* Pew Charitable Trusts, "*Collateral Costs: Incarceration's Effect On Economic Mobility*" (2010) at 5 (children with fathers who have been incarcerated are significantly more likely than other children to be expelled or suspended from school (23 percent compared with 4

percent); *id.* at 18 (incarceration creates economic aftershocks for children and families, which are disrupted, destabilized and deprived of a wage-earner, leading to a decline in household income as well as an increased likelihood of poverty); *id.* at 21 ( "Research also indicates that children whose parents serve time have more difficulty in school than those who do not weather such an experience. One study found that 23 percent of children with a father who has served time in a jail or prison have been expelled or suspended from school, compared with just 4 percent of children whose fathers have not been incarcerated).[7]

While the cases discussed above considered family circumstances as a basis for a downward departure from the sentencing guidelines, which Mr. Bakhtiari does not seek here, the same considerations justify a downward variance under Section 3553(a)(1) in this case.  As noted above, Mr. Bakhtiari's conviction alone will result in the possible permanent separation from his wife and children and most of his immediate family.  This is an unusually harsh collateral consequence to Mr. Bakhtiari's two young sons, and one that is not faced by an American offender in similar circumstances.

### C.    A Longer Term of Imprisonment is Not Necessary in This Case to Achieve Specific or General Deterrence

Given the punishment already meted out to Mr. Bakhtiari and that he will suffer in the future quite apart from imprisonment for this offense, the recommended sentence is adequate for purposes of both specific and general deterrence.  Mr. Bakhtiari will have a felony conviction for the rest of his life, making him virtually unemployable and, because of his immigration status, likely unable to enter the U.S. to see his family.  This alone is sufficient deterrence.

Moreover, statistically, a longer jail sentence does not necessarily increase the deterrence effect, particularly in white collar cases.  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"); *see generally* Valerie Wright, Ph.D., *Deterrence in Criminal Justice:  Evaluating Certainty v. Severity of Punishment, The*

---

[7]  Available at http://www.pewcenteronthestates.org/report_detail.aspx?id=60919.

*Sentencing Project* (November 2010) (it is the certainty of punishment, not the length of incarceration, that most effectively serves as a general deterrence).  In short, given the specifics of Mr. Bakhtiari's offense conduct and his personal experiences, a custodial or longer sentence will not further deter future conduct.

### D.    Mr. Bakhtiari has an Exceptionally Low Risk of Recidivism

Mr. Bakhtiari has an exceptionally low risk of recidivism.  18 U.S.C. § 3553(a)(2)(C).  He is a first-time offender with no criminal history.  PSR, ¶ 45.  Mr. Bakhtiari is 51 years old, educated, has maintained steady employment all of his life until these proceedings were initiated, and he has the unwavering support of his family.  These characteristics put Mr. Bakhtiari at an extremely low risk of recidivism.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (offenders over the age of 50 with criminal history Category I have a 9.5% recidivism rate; offenders with criminal history of Category I with no illicit drug use have a 10.8% recidivism rate); Ex. 10 (legally married offenders with a criminal history of Category I have a 9.8% recidivism rate); Ex. 11 (fraud offenders with a criminal history of Category I have a 9.3% recidivism rate); *see also* Shirley R. Klein *et al., Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, *Gender, Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate,").

Moreover, among low-risk offenders, such as Mr. Bakhtiari, more time in prison actually leads to increased risk of recidivism because of the loss of "pro-social contacts in the community," and the removal from "legitimate opportunities."  *See* Wright, *supra,*  at p. 7;[8] *see also,* United States Sentencing Commission, Staff Discussion Paper, *Sentencing Options Under the Guidelines* (1996) (recognizing the "criminogenic effects of imprisonment which include contact with more serious

---

[8]  http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf.

offenders, disruption of legal employment, and weakening of family ties").  The "criminogenic effects" of imprisonment will be a greater issue for Mr. Bakhtiari, since his immigration status will result in his being incarcerated with more serious offenders.

### E.  Mr. Bakhtiari's Medical Condition

In addition to the factors noted above, Mr. Bakhtiari's medical condition provides a basis for a downward variance, as the Probation Office notes.  PSR, Sentencing Recommendation.  He is on several medications to treat early onset Dementia and possible Alzheimers.  PSR ¶ 56.  *See* 18 U.S.C. § 3553(a)(2)(D) (court should consider the need to provide the defendant with needed medical care).  His medical condition may make him more vulnerable in prison, particularly given his likely place and conditions of confinement due to his immigration status.

### III.  Objections to Restitution Amounts

The Presentence Report suggests that the government can seek restitution for Sonnen Motorcars' legal fees and costs of investigation of approximately $650,000.  PSR, Addendum to Sentencing Report, Response to Defendant's Objection No. 2.  However, the Supreme Court has held that a victim is not entitled to restitution for legal fees or costs of investigation unless the government can prove that those costs were incurred at the request or direction of the government during the government investigation.  *United States v. Lagos,* 138 S.Ct. 1684, 1688-89 (2018) (MVRA does not permit restitution for a victim's legal fees and investigative costs that it chose on its own to conduct before the government investigation).  Because Peter Sonnen has pursued and is pursuing civil litigation against Mr. Bakhtiari, his wife, and others, the legal fees and investigative costs appear to be related to that civil suit, rather than costs incurred on behalf of the government.

Furthermore, under the Mandatory Victims Restitution Act ("MVRA") the government bears the burden of proving the amount of requested restitution.  *United States v. Waknine,* 543 F.3d 546, 556 (9th Cir. 2008) (the government bears the burden of proving that a person or entity is a victim for purposes of restitution as well as the amount of restitution owed).  Here, the government has offered no evidence to support the claimed restitution amount for legal fees and costs.

As for the remaining restitution amount claimed for Sonnen Motorcars, any restitution order should be joint and several and apportioned among the other coconspirators.  18 U.S.C. § 3664(h).

According to the government's calculations of the tax loss, the amount of unreported fraud proceeds received by Mr. Bakhtiari personally was $3,988,777.96, and Mr. Bakhtiari has agreed in his plea agreement to a restitution amount of no less than $4,300,000.  Plea Agreement ¶ 9. [9]

### CONCLUSION

Mr. Bakhtiari is a first-time offender with no criminal history. He has worked his entire life, has a wife and two young boys, and is facing deportation to Iran as a result of his conviction.  He will likely suffer conditions of confinement much harsher than others with the same sentencing guideline range and security classification, apart from his immigration status.  Sentencing Mr. Bakhtiari to a term of imprisonment within the guideline range serves no social purpose and punishes Mr. Bakhtiari unnecessarily harshly.  For the foregoing reasons, and based on the record herein, a sentence of 36 months imprisonment is sufficient, but not greater than necessary, to serve the purposes of sentencing under Section 3553.

Dated:  October 22, 2019

BOERSCH & ILLOVSKY LLP

_/s/Martha Boersch_____
Martha Boersch

Attorney for Defendant Amir Bakhtiari

---

[9]  Mr. Bakhtiari notes that the government already has the personal property it seeks to forfeit. The value of that property is unclear, but pursuant to the asset agreement attached as Exhibit A to his Plea Agreement, that property will be liquidated and applied to any restitution ordered. As for the real property, Mr. Bakhtiari and his wife have already sold their home and in accordance with the asset agreement the government has already obtained half of the proceeds of that sale.

# EXHIBIT

# A

# Social Security Notice

Date: May 9, 2019

Claim Number: xxx-xx-6742

Amir Galehbakhtiari
18 LANDPORT
NEWPORT BEACH, CA 92660

You must meet certain medical and nonmedical requirements to be entitled to disability benefits.

We have found that you meet the medical requirements for disability benefits. An explanation of our findings follows. Please read it carefully.

We used the following report(s) in deciding your claim:

UC/Irvine/UCI Medical Center report received 03/16/2019

Michelle Molina, Ph.D. report received 03/20/2019

Gustavo Alva, M.D. report received 03/26/2019

Michelle Molina, Ph.D. report received 04/26/2019

You said that you became unable to work on July 1, 2017 because of dementia.

While you stopped work because of your condition, the medical evidence did not show your condition was severe enough to meet our requirements until your examination on March 7, 2018. Because of the severity of your condition at that time and medical experience with your type of condition, your impairment(s) met our requirements as early as March 7, 2018.

We have not yet made a decision about whether you meet the nonmedical requirements, but we will make that decision soon. Then we will send you a second notice explaining our decision. AFTER YOU RECEIVE THIS SECOND NOTICE, YOU WILL HAVE 60 DAYS TO APPEAL THE DETERMINATION WE MADE ABOUT YOUR CLAIM FOR DISABILITY BENEFITS.

IF YOU HAVE ANY QUESTIONS ABOUT YOUR DISABILITY CLAIM OR WISH TO APPEAL OUR FINDINGS, PLEASE DO NOT GET IN TOUCH WITH THE SOCIAL SECURITY OFFICE UNTIL YOU HAVE THE SECOND NOTICE. The people at the Social Security office will be better able to answer your questions when they have the information from both notices. You can look us up online at www.ssa.gov or call our national 1-800 number at 1-800-772-1213.

## If You Want Help with Your Appeal

You can have a friend, lawyer, or someone else help you. There are groups that can find you a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge

unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. If you hire a lawyer, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

After you have received your second notice, you can call or write any Social Security office to appeal our determination or to get answers to your questions. Most questions can be handled by telephone or mail. If you go to the Social Security office in person, please take both notices with you.

**Suspect Social Security Fraud?**

If you suspect Social Security fraud, please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

**Social Security Administration**

# EXHIBIT B



**DEPARTMENT OF MOTOR VEHICLES**
LICENSING OPERATIONS DIVISION
Driver Safety Branch
790 The City Drive, Suite 420
Orange, CA  92868-4941

Telephone: (714) 703-2511    FAX: (714) 703-2526

| DMV USE ONLY |
|---|
| ☐ **Applicant cleared by Driver Safety.  OK to process.** |
| ☐ **Law** ☐ **Vision** ☐ **Drive Test(s) Passed** |
| Date _____        Initials _____ |

DRIVER LICENSE NUMBER
A9730256

Amir Galehbakhtiari
18 Landport
Newport Beach, C A 92660

We have reviewed the information contained in your file and have determined the following:

☒ No further contact with the department is necessary at this time.

☒ No action is warranted at this time.

☐ Please return to your nearest DMV field office to complete your driver license application.

☐ Use the enclosed temporary license.

☐ **DO NOT** return to the DMV field office, your driver license will be mailed to you.

☐ Please have the enclosed medical form(s) completed by the doctor most familiar with your medical history. Upon review, you will be notified if a reinstatement interview is necessary or if your license will be reinstated.

☐ You will be scheduled for a follow-up reexamination in __ months to review your ability to operate a motor vehicle safely.

☐ Your driving privilege will remain on medical probation.

   ☐ The next medical report will be due on _____.

☐ Please report any adverse change in your condition to your physician and the department immediately.

☐ Commercial drivers with insulin-treated diabetes mellitus may not be medically qualified for more than 12 months. Your medical expiration date is _____.

☐ Restrictions 45 (No Passenger Vehicles/No Hazardous Materials) and 67 (Intrastate Commerce Only) have been removed from your driving record.

☒ We are in receipt of the Driver Medical Evaluation you sent 05/20/19. Unfortunetly after review, the physician reported that you are still diagnosed with a Moderate Overall Degree of Dementia Impairment, and your medical condition effects safe driving and advises against it. A Reinstatement interview is not warranted at this time.

We appreciate your cooperation in completing this evaluation process and regret any inconvenience this may have caused.  However, it is the department's responsibility to ensure that all licensed drivers can safely operate a motor vehicle.

If you have any questions about this notice, please call or write the office shown above.

Online appointment information may be obtained at the DMV website at:
http://www.dmv.ca.gov/fo/fotoc.htm  or call 1-800-921-1117.  Call 1-800-777-0133 to schedule drive test.

| DATE | NAME OF AUTHORIZED DMV EMPLOYEE | SIGNATURE OF AUTHORIZED DMV EMPLOYEE |
|---|---|---|
| June 6, 2019 | A. Stoll | X |

California Relay Telephone Service for the deaf or hard of hearing from TDD Phones: 1-800-735-2929; from Voice Phones: 1-800-735-2922

# EXHIBIT C



# EXHIBIT D

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| NOTICE TYPE | NOTICE DATE |
|---|---|
| Receipt | June 14, 2017 |

| CASE TYPE | USCIS ALIEN NUMBER |
|---|---|
| I-485, Application to Register Permanent Residence or Adjust Status | A214552724 |

| RECEIPT NUMBER | RECEIVED DATE | PAGE |
|---|---|---|
| MSC1791380197 | June 09, 2017 | 1 of 1 |

| PRIORITY DATE | PREFERENCE CLASSIFICATION | DATE OF BIRTH |
|---|---|---|
| June 09, 2017 | 201 B INA SPOUSE OF USC | December 23, 1967 |

**PAYMENT INFORMATION:**

AMIR G. BAKHTIARI
C/O JEFF KHURGEL KHURGEL IMMIGRATION LAW FIRM
4199 CAMPUS DRIVE STE 550
IRVINE, CA  92612

24  00008172

| Application/Petition Fee: | $1,140.00 |
|---|---|
| Biometrics Fee: | $85.00 |
| Total Amount Received: | $1,225.00 |
| Total Balance Due: | $0.00 |

**NAME AND MAILING ADDRESS**

The above application/petition has been received by our office and is in process. Please verify your personal information listed above and immediately notify the USCIS National Customer Service Center at the phone number listed below if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

Next Steps:
- USCIS will schedule a biometrics appointment for you to have your biometrics electronically captured at a USCIS Application Support Center (ASC). You will be receiving a biometrics appointment notice by mail with the specific date, time, and place where you will have your fingerprints and/or photographs taken.
- You must wait to receive your biometrics appointment notice before going to the ASC for biometrics processing.
- This notice does not serve as your biometrics appointment notice.

If you have questions about possible immigration benefits and services, filing information, or USCIS forms, please call the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**.  If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**. Please also refer to the USCIS website: www.uscis.gov.

If you have any questions or comments regarding this notice or the status of your case, please contact our customer service number.

You will be notified separately about any other case you may have filed.

| **USCIS Office Address:** | **USCIS Customer Service Number:** |
|---|---|
| USCIS | (800)375-5283 |
| National Benefits Center | **ATTORNEY COPY** |
| P.O. Box 648003 | |
| Lee's Summit, MO  64002 | |





If this is an interview or biometrics appointment notice, please see the back of this notice for important information.          Form I-797C  07/11/14  Y

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

| THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT. |
| :---: |

| NOTICE TYPE | NOTICE DATE |
| --- | --- |
| Receipt | June 14, 2017 |

| CASE TYPE | USCIS ALIEN NUMBER |
| --- | --- |
| I-765, Application for Employment Authorization | A214552724 |

| RECEIPT NUMBER | RECEIVED DATE | PAGE |
| --- | --- | --- |
| MSC1791380200 | June 09, 2017 | 1 of 1 |

| | DATE OF BIRTH |
| --- | --- |
| | December 23, 1967 |

AMIR G. BAKHTIARI
C/O JEFF KHURGEL KHURGEL IMMIGRATION LAW FIRM
4199 CAMPUS DRIVE STE 550
IRVINE, CA 92612

24 - 00008173

**PAYMENT INFORMATION:**

| | |
| --- | --- |
| Application/Petition Fee: | $0.00 |
| Biometrics Fee: | $0.00 |
| Total Amount Received: | $0.00 |
| Total Balance Due: | $0.00 |

**NAME AND MAILING ADDRESS**

**Eligibility Category: C09**

The above case has been received by our office and is in process. Please verify your personal information listed above and immediately notify the USCIS National Customer Service Center at the phone number listed below if there are any changes.

Please note that if a priority date is printed on this notice, the priority does not reflect earlier retained priority dates.

As a reminder, if you have an underlying Form I-140 that is approved or is still pending, you may request to change employers under INA 204(j) if your Form I-485 Adjustment application has been pending for at least 180 days. In order to do so, you should supplement the Form I-485 record of proceeding with documentation relating to the new job offer that forms the basis of the INA 204(j) portability request. For more information on how to request to change employers and what information is required to supplement the Form I-485, please visit www.uscis.gov.

If you have questions about possible immigration benefits and services, filing information, or USCIS forms, please call the USCIS National Customer Service Center (NCSC) at **1-800-375-5283**. If you are hearing impaired, please call the NCSC TDD at **1-800-767-1833**. Please also refer to the USCIS website: www.uscis.gov.

If you have any questions or comments regarding this notice or the status of your case, please contact our customer service number.

You will be notified separately about any other case you may have filed.

This notice, by itself, does not grant any immigration status or benefit, nor is it evidence that this case is still pending. However, **if**:
- You have timely filed to renew your current Form I-766 Employment Authorization Document (EAD); **and**
- Your EAD renewal is under a category that is eligible for an automatic 180-day extension (see www.uscis.gov/I-765 for a list of categories); **and**
- The Category on your current EAD matches the "Class Requested" listed on this Notice of Action; (Note: If you are a TPS beneficiary or applicant, your EAD and this Notice must contain either the A12 or C19 class, but they do not need to match each other.); **and**
- You do not receive your renewal EAD before your current EAD expires;,
- **then** this Notice of Action automatically extends the validity of your EAD for up to 180 days from the expiration date printed on the face of the card. If all of the above conditions apply with respect to your EAD renewal application, you may present this Notice of Action with your expired EAD to your employer for employment eligibility verification (Form I-9) purposes. If your renewal application is denied, the automatic extension immediately terminates, and you may not provide this Notice of Action with your expired EAD for Form I-9 purposes. If your EAD is a combo card, the automatic extension does not apply to advance parole. For more information, please visit our website at www.uscis.gov/I-765.

| **USCIS Office Address:** | **USCIS Customer Service Number:** |
| --- | --- |
| USCIS | (800)375-5283 |
| National Benefits Center | ATTORNEY COPY |
| P.O. Box 648003 | |
| Lee's Summit, MO 64002 | |





If this is an interview or biometrics appointment notice, please see the back of this notice for important information.    Form I-797C 07/11/14 Y

# EXHIBIT

# E

1  KEKER, VAN NEST & PETERS LLP
   JOHN W. KEKER - # 49092
2  jkeker@keker.com
   JAN NIELSEN LITTLE - # 100029
3  jlittle@keker.com
   BROOK DOOLEY - # 230423
4  bdooley@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendant
   SUSHOVAN HUSSAIN

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12 UNITED STATES OF AMERICA,            Case No. 3:16-cr-00462-CRB

              Plaintiff,               **DECLARATION OF JOEL A. SICKLER**
13                                     **IN SUPPORT OF SUSHOVAN**
                                       **HUSSAIN'S SENTENCING**
14        v.                           **MEMORANDUM**

15 SUSHOVAN HUSSAIN,                    Judge:     Hon. Charles R. Breyer

              Defendant.               Date Filed: November 10, 2016
16

17

18

19

20

21

22

23

24

25

26

27

28

1310617

# DECLARATION OF JOEL A. SICKLER

I, Joel A. Sickler, have knowledge of the facts set forth herein, and if called upon as a witness, I could testify competently under oath, as follows:

1.      I have been asked by counsel for defendant, Sushovan Hussain (the "Defendant" or "Mr. Hussain"), to assess conditions of confinement considering the security classification of the Defendant within the federal Bureau of Prisons ("BOP").  As set forth below, in light of Mr. Hussain's status as a sentenced non-resident alien, if incarcerated he will be classified as "low" security and will not be eligible to be housed at a "minimum-security" camp facility, such that he will experience considerably harsher conditions of confinement than those experienced by American "white collar" offenders.  Also, as a non-resident alien, he will be at significant risk to be housed at a private contract prison, where conditions are even worse than at a regular federal prison.  In addition, unless he is designated to one of a limited number of institutions described below, he will be subject to an additional period of incarceration in an ICE detention center following completion of any federal prison sentence.  Finally, his status as an alien disqualifies him from end-of-sentence reentry programs that are available to American inmates to shorten their terms of incarceration.  For all of these reasons, described in detail below, any period of incarceration required of Mr. Hussain will be considerably more restrictive, more dangerous, more arduous, and longer, than would be the experience of an American "white collar" offender with an equivalent sentence.

2.      I have worked in the field of sentencing and corrections for more than 35 years and currently head the Justice Advocacy Group, LLC, a consortium of criminal justice professionals based in Alexandria, Virginia.  I have worked consistently since 1980 on federal sentencing and federal prison-related matters and have experience as a correctional counselor in the District of Columbia's Department of Corrections and with prior tenure as Director of Client Services at the National Center on Institutions & Alternatives in Washington, D.C.

3.      I have visited 51 federal prisons and have advised clients with inmate matters in 86 of the BOP's 122 institutions.  Before the abolishment of parole, I represented hundreds of federal inmates before the U.S. Parole Commission.  Based on more than three decades of experience

1310617

assisting clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices.

4.     I have reviewed and am thoroughly familiar with the following Program Statement of the federal Bureau of Prisons: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 12, 2006).  I have spoken on numerous occasions with personnel at the Bureau's Designation and Sentence Computation Center ("DSCC")[1] and regional and central office officials in the correctional programs administration when seeking clarification about a specific policy/program statement.  Finally, here, I have additionally conferred with defense counsel about Mr. Hussain, reviewed case materials regarding the Defendant's case, and interviewed Mr. Hussain in the presence of counsel.

5.     Accordingly, my background and experience permit me to assess likely conditions of confinement in light of Mr. Hussain's personal background and circumstances, including his status as an alien (citizen of the United Kingdom) who will be committed to the custody of the federal Bureau of Prisons (BOP).

6.     This declaration will address the following issues, which would arise should the Court impose a sentence of imprisonment:

(a) if sentenced to a term of imprisonment, although classified minimum-security (i.e., camp-eligible), Mr. Hussain will be assigned to a secure prison and not a minimum-security "camp";

(b) the BOP may place him in a private, contract facility for sentenced aliens, potentially placing him at greater risk;

(c) after serving any prison sentence, he is subject to having to serve an additional period in custody in ICE detention as he awaits deportation;

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations or assignments and inter-facility transfers are processed and made by the DSCC.

1310617

(d) as a non-resident alien he will be denied the opportunity to be pre-released to the community (to a community-based reentry center or halfway house or home confinement) toward the end of his custodial sentence; and

(e) if remanded immediately after sentencing rather than being allowed to self-report, Mr. Hussain will experience additional harsh conditions.

## I.  MR. HUSSAIN WILL BE IMPRISONED IN A SECURE FEDERAL CORRECTIONAL INSTITUTION ("FCI")—NOT A PRISON CAMP

7.  Ordinarily, after the imposition of a sentence of imprisonment, a defendant with Mr. Hussain's offense (non-violent), who has no history of violence, no prior criminal record, and no outstanding detainers, would be eligible to be designated by the BOP to a minimum-security prison "camp."[2]  However, BOP designators also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for security considerations not included in their numeric security point system.  In Mr. Hussain's case, if he is sentenced to a term of imprisonment, although he will have a total of only five (5) security level points, a PSF of "Deportable Alien" will be assigned to his security classification, which will necessarily result in a prison assignment above the "minimum" (or camp) range.[3]  Mr. Hussain will be designated as at least a "low-security" inmate, rather than as a "minimum-security" one.  Low-security prisons generally have security protocols and living conditions far different than what exists at the minimum-security, camp level.  There are four main differences between a minimum-security camp versus a low-security prison.

---

[2] Mr. Hussain's BOP security level scoring utilizing the BP-A337.051 (Inmate Load and Security Designation Form) is estimated to be as follows: he may not be allowed to surrender voluntarily (0 pts.); his offense (property offense > $250,000) severity will be rated "Moderate" (3 pts.); he has no prior criminal history (0 pts.); no history of prior violence (0 points); no history of escape (0 pts.); no outstanding detainers (0 pts.); he is 54-years old (2 pts.); he has graduated high school (0 pts.); and he has no history of substance abuse within the last five years (0 pts.). Therefore, his total security designation points are *five* (5) yielding a security level of "Minimum." Per BOP P.S. 5100.08 (9/12/2006) at Table 5-2, Security Point Totals of 0-11 equate to an Inmate Security Level of "Minimum."

[3] U.S. Dep't of Justice, Fed. Bureau of Prisons, P.S. 5100.08, Inmate Security Designation & Custody Classification, ch. 5, p. 9, Code H (Sept. 12, 2006), https://www.bop.gov/policy/progstat/5100_008.pdf ("A male or female inmate who is not a citizen of the United States…shall be housed in at least a Low security level institution."); *see also id.* at 12 tbls. 5-2 & 5-3 ("Deportable Alien = Minimum Security Level 'Low.'").

3

1310617

8.     The first difference is the perimeter security and other forms of heightened security.  Federal Prison Camps (FPCs) are fenceless compounds that have the appearance and feel of an austere college campus.  Camps do not have "controlled movements" that restrict inmates' movements to certain designated times.  By contrast, a Federal Correctional Institution (FCI) is surrounded by physical barriers to prevent escape: walls, fencing with concertina wire, secured and defensible main gates, armed guard towers, security lighting, motion sensors, dogs and roving patrols.  Within the institution, remotely controlled doors, CCTV monitoring, alarms, cages, restraints, nonlethal and lethal weapons, riot-control gear, and physical segregation of units are used to maintain security.  In an FCI, inmate movement throughout the facility is highly controlled, with access from one location to the other allowed only for 10 minutes at the top of each hour.  Mass body checks, where groups of inmates are strip searched so officers can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are routinely conducted.  Such assembly searches are not done at the camp level.  Housing units are searched far more frequently than at the camp level.

9.     The second difference is the institution's size, mindset and crowding: FCIs are five to ten times larger than camps.  As a rule, the bigger the institution, the more stressful it is on the general population in the prison.  Large FCIs have cramped housing quarters where 90-100 inmates sleep in small cubicles with four or more bunk beds and compete for use of the dozen or so showers, sinks, and toilets.  Most BOP facilities house more inmates than they are designed for.  However, the camps are far less crowded than the low-security FCIs.  For instance, the closest low-security FCI to New York City is located on the Fort Dix Army base in New Jersey and currently houses 4,226 inmates.[4]  FCI Fort Dix is designed to hold 3,781 inmates and is remarkably only 11.8 percent over capacity.  However, the next closest are FCI Allenwood (current population of 1,241 is 25.1 percent above the rated capacity of 992) and FCI Danbury (current population of 791 is 42.8 percent above the rated capacity of 554).  In contrast, the three camps located in the Northeast Region close to New York City (Otisville, NY; Fairton, NJ; and

---

[4] All population figures are current as of September 27, 2018 and are available at
https://www.bop.gov/about/statistics/population_statistics.jsp.

1310617

Canaan, PA) currently house anywhere from 103 to 120 inmates – one of these camps is slightly above capacity (4 percent over capacity) and two of them are operating under capacity.

10.     Overcrowding results in cubicles that are quadruple bunked, and in some facilities, inmates are placed on mattresses on the floor in "overflow units."  Sleep disturbances (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common.  Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block nighttime noise. Inmates may be awakened repeatedly for late night head counts.

11.     Other problems exist in the more crowded FCIs.  For instance, there are longer lines to use the telephone, to see a member of your unit team, for medications and checkups, or to use the library.  Difficulty accessing a telephone will have greater impact on Mr. Hussain than on American inmates, because his family and friends are all in the U.K. making their visits less frequent, and because the time zone difference will already pose significant limitations on possible times for him to be able to make calls to waking hours in the U.K.  Crowding also impacts food service in FCIs.  The busy, noisy cafeteria serves institutional food, pre-packaged, pre-made, sometimes days before it is served. Inmates eat in shifts (each housing unit is called in an ever-changing rotation), and if your unit is called last, most of the edible food is gone.  Religious restrictions in Mr. Hussain's diet will further limit his choices from already limited food offerings.  Naturally there are also long lines to use toilets, sinks, and showers.

12.     Cramped, crowded conditions where thousands of men are virtually on top of one another also result in such prisons being unsanitary, even rodent infested.

13.     The third difference between an FPC and an FCI is the type of inmate.  The camps house generally younger drug offenders who are serving sentences generally of less than 10 years; often they have cooperated with the government.  Camp inmates generally are first-time offenders who have committed nonviolent crimes, have minor to no criminal history, and pose no public safety or flight risk.  They tend to generally behave well out of fear they will end up in a higher security institution (infractions can penalize a camp inmate with a transfer to a low-security facility.  Otherwise, camps house "white-collar" property offenders convicted of offenses

5

1310617

such as those of which Mr. Hussain was convicted.  By contrast, inmates at low-security FCIs (which also house drug offenders, but those of the more serious kind), are generally serving sentences greater than 10 years, likely have a prior record involving a gun or violent offense, may be gang-affiliated, or are otherwise security or flight risks.  FCIs also house all deportable aliens, members of organized crime, drug cartel leaders, and all serious sexual offenders.  Statistically, there is a 143 percent greater chance of being assaulted at an FCI as opposed to a camp.[5] Furthermore, the rate of "serious assault" is 553 percent higher in low-security institutions than minimum-security camps.[6]

14.     The last difference is with regard to visitation.  At a camp, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show ID and then their incarcerated loved-one appears.  In addition, the average camp has an outdoor picnic area for visitation during warm months, which means a great deal to the family of someone inside.  By contrast at an FCI, visitors are met with the imposing walls and barbed wire and must proceed to a guarded gate to access the facilities parking area.  They are observed by officers on patrol in the parking lot.  Once inside the prison, they pass through metal detectors, and are subjected to random pat down searches (with vehicles on the property also subject to inspection). Their hands are tested for drug use, they are escorted through several check points, and they wait, sometimes for long periods, for their friend or family member to be brought to the visiting room (a crowded indoor environment).  The impact of these measures on a visiting family member should not be underestimated, and in my experience color the entire visitation experience for both the inmate and the visitor.  When visitors are from far away and their visits less frequent, the effect is magnified.

---

[5] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017.  *See* Fed. Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[6] *Id.*  Serious assault is defined in BOP P.S. 5270.09, Inmate Discipline Program, p.44, tbl.1 (August 1, 2011): CODE 101 - Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished).

1310617

15.     If Mr. Hussain is sentenced to a term of imprisonment, under applicable BOP regulations he will, based solely on his U.K. citizenship, be housed in an institution that is significantly harsher than that to which an American executive would be housed.  Despite his "white collar" background, he will be housed with persons of much more serious criminal background, and will experience enhanced liberty deprivations. Prison is hard enough for even the toughest of souls.  Mr. Hussain is 54-years old and has no prior criminal history or experience with criminal activity.  His family lives an ocean away.  And he will be imprisoned in a crowded, noisy prison, which employs security measures far beyond what is required for his care and custody.

## II.     IF SENTENCED TO A TERM OF IMPRISONMENT, MR. HUSSAIN, AS A DEPORTABLE ALIEN, RISKS BEING SENT TO A PRIVATE PRISON

16.     As detailed in ¶ 7, if Mr. Hussain is sentenced to a term of imprisonment, he will be designated to a secure prison because he is not a U.S. citizen.  The harshness of his confinement may be further negatively compounded if the BOP designates Mr. Hussain to one of their privately contracted facilities designed to incarcerate sentenced aliens.  These privatized facilities comprise 15 percent of the BOP's total infrastructure.  These institutions are favored by the Bureau of Prison for the incarceration of deportable aliens, in an effort to save costs.  Indeed, according to the New York Times, private prisons house an extremely high share of the nation's immigrant detainees—as much as "73 percent by some accounts."[7]  Essentially the BOP's philosophy (while not publicly stated) is to house deportable aliens in facilities with few rehabilitative and release preparedness programs, and modest health care budgets, because the inmates will be sent back to their native countries in time and are therefore "someone else's problem."[8]  In my decades of experience, non-citizens are designated to private prison facilities in the vast majority of all cases.  The privatized facilities in general are well known for housing

---

[7] *See* Clyde Haberman, *For Private Prisons, Detaining Immigrants Is Big Business*, N.Y. TIMES (Oct. 1, 2018), https://www.nytimes.com/2018/10/01/us/prisons-immigration-detention.html ("Private companies house about 9 percent of the nation's total prison population.  But they take care of a much higher share of immigrant detainees—73 percent by some accounts.").

[8] *See* BOP's Inmate Occupational Training Directory and Directory of National Programs (Sept. 15, 2017), *available at* www.bop.gov. The vast array of programs focused on inmate rehabilitation listed in this publication are not offered at the BOP contract facilities.

1310617

1  inmates of more serious security classifications than even the typical low-security FCI compound.

2  A privately contracted federal prison, where Mr. Hussain will be surrounded by violent offenders,

3  is going to be an extremely frightening environment for him and is far beyond the experience

4  normally imposed upon someone with Mr. Hussain's non-violent conviction and absence of

5  criminal background.[9]

6      17.     Thus, holding Mr. Hussain at a privately contracted BOP facility would serve to

7  multiply the severity of his sentence.  Given his personal level of vulnerability within this type of

8  environment, the experience will be unduly heightened in terms of punitive effect in these

9  extremely stressful circumstances.  The ACLU in a report from June of 2014 stated: "These

10  private prisons operate in the shadows, effectively free from public scrutiny.  By statute, most of

11  their records are exempt from the open records laws that apply to other federal prisons.

12  Meanwhile, as detailed in this report, [the] BOP fails to subject its private prison contractors to

13  adequate oversight and accountability, and it fights to avoid public disclosure of basic

14  information about these prisons."[10]  In a speech to the American Bar Association, former U.S.

15  Attorney General Eric Holder emphasized that "we need to ensure that incarceration is used to

16  punish, deter, and rehabilitate – not merely to warehouse and forget."[11]  The ACLU report

17  continued: "Yet as this report illustrates, we are doing exactly that to more than 25,000 non-

18  citizen prisoners in for-profit [Criminal Alien Requirement] prisons.  This practice cannot be

19  justified on grounds of safety, fairness, or cost effectiveness."[12]

20      18.     A 2014 report from The Marshall Project regarding the Private Prison Information

21  Act, which was introduced in Congress, sought to shed some light on these issues.  The report

22

23  [9] *See* Joe Davidson, *Private Federal Prisons: Less Safe, Less Secure*, WASH. POST (Aug. 12, 2016),
   https://www.washingtonpost.com/news/powerpost/wp/2016/08/12/private-federal-prisons-less-safe-less-
24  secure/?utm_term=.fe3ac3d3c4ea.

25  [10] Am. Civil Liberties Union, Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private
   Prison System 5 (June 2014), https://www.aclu.org/sites/default/files/assets/060614-aclu-car-
   reportonline.pdf.

26  [11] Eric Holder, U.S. Attorney General, U.S. Department of Justice, Remarks at the Annual Meeting of the
   American Bar Association's House of Delegates (Aug. 12, 2013),
27  http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

28  [12] *See supra* note 10.

8

DECLARATION OF JOEL SICKLER IN SUPPORT OF SUSHOVAN HUSSAIN'S SENTENCING
MEMORANDUM
Case No. 3:16-cr-00462-CRB

1310617

stated: "The federally funded private prisons, holding mostly immigrants awaiting deportation, remain a black box.  Lawyers, advocates and investigators have tried to piece together a picture of how they run, but large swaths of the industry remain a mystery."[13]

19.     The DOJ and BOP understood the need to address these real and harmful problems within its privatized system when Deputy Attorney General Yates noted in a memorandum [8/18/16] that: "the federal prison population has begun to decline . . . [P]rivate prisons served an important role during a difficult period, but time has shown that they compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources, they do not save substantially on costs . . . [T]he rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource – and these services are essential to reducing recidivism and improving public safety."[14]

20.     An Inspector General review of BOP contract prison facilities in 2016 found: "contract prisons incurred more safety and security incidents per capita than comparable BOP institutions . . . [T]he BOP must still improve its oversight of contract prisons to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons .

---

[13] Christie Thompson, *Everything You Ever Wanted to Know About Private Prisons . . . Is None of Your Damn Business*, THE MARSHALL PROJ. (Dec. 18, 2014, 12:26 p.m.), https://www.themarshallproject.org/2014/12/18/everything-you-ever-wanted-to-know-about-private-prisons.

[14] Memorandum from Sally Q. Yates, Deputy Attorney General, to Acting Director, Fed. Bureau of Prisons 1 (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download; *see also* Julia Zorthian, *Justice Department Will Stop the Use of Private Prisons*, TIME (Aug. 18, 2016, at 3:02 p.m.), http://time.com/4457597/private-prisons-justice-department/; Press Release, Prison Legal News, U.S. Dept. of Justice Announces Phase Out of Private BOP Prisons (Aug. 19, 2016), https://www.prisonlegalnews.org/in-the-news/2016/us-dept-justice-announces-phase-out-private-bop-prisons/.

DECLARATION OF JOEL SICKLER IN SUPPORT OF SUSHOVAN HUSSAIN'S SENTENCING MEMORANDUM
Case No. 3:16-cr-00462-CRB

1310617

1 . . BOP needs to improve how it monitors contract prisons."[15]  Other reports from 2012 through

2 the present day still mirror/expand on the OIG findings and should be noted as well.[16]

3      21.    The present Administration has seen an increased emphasis on incarcerating

4 aliens, and an increased dependence on federal private prisons.  In February 2017 Attorney

5 General Sessions issued guidance reversing an Obama administration policy to phase out private

6 prisons.[17]  In a January 24, 2018 memorandum BOP Assistant Director Lara (Correctional

7 Programs Division) effectively doubled down on the failed business side of privatized

8 corrections. The memo from AD Lara stated: "In order to alleviate overcrowding at BOP

9 institutions and to maximize the effectiveness of the private contracts . . . please submit eligible

10 inmates for re-designation . . . for transfer consideration to private contract facilities."[18]

## III.    THE ADDED PUNISHMENT OF ICE DETENTION AND DEPORTATION

12      22.    Mr. Hussain's post-incarceration return home will be further complicated by the

13 difficulty of a U.S. Immigration and Customs Enforcement (ICE) detainer that will be placed on

14 him (upon incarceration) to eventually accommodate the process of deporting him as a foreign

[15] U.S. Dep't of Justice, Office of the Inspector General, Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons (Aug. 2016), https://oig.justice.gov/reports/2016/e1606.pdf.

[16] Alene Tchekmedyian, *Thousands of Immigrant Detainees Sue Private Prison Firm Over 'Forced' Labor*, L.A. TIMES (Mar. 5, 2017, 5:00 a.m.), http://www.latimes.com/nation/la-na-immigrant-workers-20170305-story.html; Ryan J. Reilly, *Damning Report Finds For-Profit Prisons Are More Dangerous*, HUFFINGTON POST (Aug. 11, 2016, 5:32 p.m.), https://www.huffingtonpost.com/entry/for-profit-prisons_us_57acafe7e4b0718404101f14; Judith Greene & Alexis Mazon, Privately Operated Federal Prisons for Immigrants: Expensive, Unsafe, Unnecessary, Justice Strategies (Sept. 13, 2012), https://justicestrategies.org/sites/default/files/publications/Privately%20Operated%20Federal%20Prisons%20for%20Immigrants%209-13-12%20FNL.pdf.

[17] *See* Lauren Gill, *Trump Administration Giving Boost to Private Prison Campaign Donors, Leaked Memo Shows*, NEWSWEEK (Jan. 30, 2018, 7:21 p.m.), https://www.newsweek.com/trump-private-prison-campaign-donors-leaked-memo-795681.

[18] Memorandum from F. Lara, Assistant Director, Correctional Programs Division, Fed. Bureau of Prisons, to Chief Executive Officers 1 (Jan. 24, 2018), https://admin.govexec.com/media/gbc/docs/pdfs_edit/012518privateprisons.pdf; *see also* Biana Padro Ocasio, *Justice Department Reverses Directive to Phase Out Private Prisons*, POLITICO (Feb. 23, 2017, 6:31 p.m.), https://www.politico.com/blogs/under-the-radar/2017/02/justice-department-private-prisons-235324; Lauren-Brooke Eisen, *Trump's First Year Has Been the Private Prison Industry's Best*, SALON (Jan. 14, 2018, 3:30 p.m.), https://www.salon.com/2018/01/14/trumps-first-year-has-been-the-private-prison-industrys-best/; Gaby Neal, *BOP-Leaked Memo Suggests Private Prisons Are on the Rise*, CORRECTIONAL NEWS (Mar. 5, 2018), http://correctionalnews.com/2018/03/05/leaked-memo-bureau-of-prisons/; Justin Glawe, *How Many More Will Die in Private Prisons Under President Trump?*, DAILY BEAST (Feb. 7, 2017, 1:00 a.m.), https://www.thedailybeast.com/how-many-more-will-die-in-private-prisons-under-president-trump.

1310617

national at the completion of his sentence.  ICE's Criminal Alien Program (CAP) is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails—the enforcement of removal is overseen by ICE's Office of Detention and Removal Operations (DRO).

23.     When the prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee."  Armed ICE agents would transport Mr. Hussain (probably by bus) to another detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S.  Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to further wait on processing to finally be sent home.  These detention and deportation procedures apply even for defendants who have the desire to leave the U.S. voluntarily at the end of their prison sentence.

24.     Another disturbing result of the formal ICE deportation process is the length of time one can be held after their sentence has been satisfied.  It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process.  All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies.  Then there is the paperwork processed by the home country in coordination with the U.S.  All of this is very time consuming and shows that an incarceratory sentence would impose a more substantial hardship on Mr. Hussain than it would upon a similarly situated U.S. person.

## IV.   AS A "DEPORTABLE ALIEN" MR. HUSSAIN WILL BE INELIGIBLE FOR VARIOUS END-OF-SENTENCE TRANSITIONAL PROGRAMS

25.     As noted above, in federal "private prisons" programming for inmates (job and educational opportunities) are severely limited.  Even if Mr. Hussain is incarcerated in a regular FCI prison, however, his status as a deportable alien will render him ineligible for various other BOP programs as well.

26.     Mr. Hussain's access to pre-release re-entry transitioning and a productively structured return to his community will also be compromised because he is not a U.S. citizen.

1310617

1  Normally, an inmate would be accorded a portion of their sentence for community re-entry

2  through one of the BOP's Residential Re-Entry Centers (RRC) or "halfway houses."  Toward the

3  end of an inmate's sentence, for a period determined as required by his transitional needs, he

4  would usually be pre-released to an RRC—likely between six and twelve months before his

5  release date (18 USC § 3621).  As a non-U.S. citizen, Mr. Hussain is not eligible for RRC or

6  "halfway house" placement.[19]

7       27.    Further, most minimum and low-security inmates are also usually pre-released (in

8  addition to their RRC or halfway house time) to home confinement for the last 10% of their

9  sentence, up to a maximum of six months (18 USC § 3624).  Again, as a British citizen, Mr.

10  Hussain will not be eligible for this program.  By being ineligible for the normal transitional

11  benefits afforded American inmates via pre-release, Mr. Hussain will be held longer in federal

12  prison—as much as a year longer—than American prisoners who can take advantage of the

13  halfway house and home confinement programs.  This is in addition to any ICE detention which

14  may be in store after completion of his prison sentence.

15  **V.  IF MR. HUSSAIN WERE TO BE REMANDED TO CUSTODY AT THE TIME OF
16  SENTENCING, HE WOULD EXPERIENCE ADDITIONAL SIGNIFICANT
   HARDSHIPS**

17       28.    Ordinarily, after the imposition of a sentence of imprisonment, a defendant with

18  Mr. Hussain's offense (non-violent), no prior criminal record, and no outstanding detainers who

19  had performed without incident under Pre-Trial supervision would be eligible to be allowed to

20  self-surrender to his designated institution on a specified future date, continuing on bond until the

21  surrender date.  Mr. Hussain has been out on bond since November 2016 and has followed all the

22  rules, including flying back and forth from the U.K. to the U.S. prior to his trial, and remaining in

23  the Bay Area since the trial—all without incident.

24       29.    While deportable aliens are sometimes seen as a greater risk to attempt to evade

25  service of sentence and may therefore be remanded at sentencing, there is no reason to apply such

26

27

28

---

[19] *See* BOP, PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure 10 (Dec. 16, 1998), https://www.bop.gov/policy/progstat/7310_004.pdf.

1310617

1  a view to Mr. Hussain who, as noted, has conducted himself with the utmost respect for the

2  criminal proceedings against him.

3     30. If Mr. Hussain were remanded immediately at sentencing, harsh "justice" would

4  be inflicted on him.  U.S. Marshals would take Mr. Hussain into custody in handcuffs.  He would

5  be escorted to the Marshal's office and processed into custody.  After all the paperwork had been

6  completed, Mr. Hussain would be transported to a local detention center, bused over with other

7  inmates.  He would be handcuffed and in leg irons throughout the transfer process.  He would

8  then in the following week likely be bused to the Los Angeles Metropolitan Detention Center

9  (MDC), again with other inmates, handcuffed and in leg irons throughout the transfer process.

10 Mr. Hussain would likely be held at the MDC for at least a month and upwards to three months

11 while he awaits the Bureau of Prisons' (BOP) Designation Center determination of his

12 designation.

13    31. The Los Angeles MDC is a secure detention facility (the BOP refers to these

14 detention centers as "Administrative" facilities) which houses pre-trial detainees deemed flight

15 risks or dangerous.  Inmates who are pre-detained have often committed violent crimes and may

16 have an extensive criminal history.  There are few educational opportunities as most "residents"

17 are there for a relatively short duration as they await their court date.  Inmates have limited access

18 to fresh air, sunlight, and exercise. Inmates are housed in cells.

19    32. The rate of assault at an administrative facility (e.g., a detention center) is even

20 higher than at low-security FCIs.  There is a 529 percent greater chance of being assaulted at an

21 administrative facility as opposed to a camp (the average number of inmate on inmate assaults at

22 an administrative facility is 85 per month as opposed to 13.5 per month at a camp).[20]  The rate of

23 "serious assault" is 1,228 percent higher in administrative institutions than minimum-security

24 camps.[21]

---

[20] *See* Fed. Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

[21] *Id.*

13

1310617

33.     Once the designation has been finalized, Mr. Hussain would be put on the list for transport.  Sometimes it can take another week or two to be moved while the U.S. Marshals schedule his transport.  Typically, defendants moving to the northeast (given that Mr. Hussain resides in England, he will very likely be designated to a facility in the Northeast Region for the purpose of facilitating visitation) from California are first moved to the BOP's Oklahoma City Federal Transfer Center (FTC) where he could remain for one to two additional weeks.  From Oklahoma, Mr. Hussain would be flown to Stewart Field in Newburgh, New York and then bused to the Brooklyn Metropolitan Detention Center (MDC) where he would be held for another one or two weeks.  Again, the Brooklyn MDC is a secure detention facility.  He would be moved from the MDC to USP Canaan's transit unit and finally bused to his designated facility.

34.     As detailed above, the transportation of Mr. Hussain from San Francisco to his final destination at a Northeast Region facility would involve no less than five separate "movements" and could take up to three months or more to complete.  During this time, he would either be housed in a secure federal detention center or in a county detention center in between locations.  He could also end up in segregation (in the SHU) during the transfer process (simply due to the lack of otherwise appropriate bedspace).[22]  The trips would be arduous as Mr. Hussain would be handcuffed and in leg irons throughout the transfer process, except during overnight stays along the way.  He would also be exposed to offenders of all security levels during both types of movement (via bus or plane).  He would have traveled thousands of very difficult miles.  Mr. Hussain's ability to contact anyone in his family during the weeks or months of this transition would be extremely limited, and quite possibly non-existent.

## VI.     IMPORTANCE OF JUDICIAL RECOMMENDATION

35.     If sentenced to a term of imprisonment, Mr. Hussain's counsel will ask that the Court make a recommendation to the BOP regarding Mr. Hussain's facility designation via the Judgement and Commitment order.  The BOP must consider any judicial recommendation.[23]

---

[22] The Special Housing Unit (SHU) consists of cells where inmates are individually housed. They are kept in the cells continuously for 23 hours per day, allowed out for only one hour per day. The conditions are deplorable.

[23] *See* BOP, PS 5100.08, Inmate Security Designation & Custody Classification ch.3, p.4 (Sept. 12, 2006).

14

DECLARATION OF JOEL SICKLER IN SUPPORT OF SUSHOVAN HUSSAIN'S SENTENCING
MEMORANDUM
Case No. 3:16-cr-00462-CRB

1310617

Without a judicial recommendation, Mr. Hussain would no doubt be assigned to a privately-run facility which has been previously established in this declaration to be a more severe environment than a BOP facility.  Given Mr. Hussain's family will be traveling from England for visits, I would suggest that FCI – Allenwood-Low would be the best facility for  Mr. Hussain's assignment for the following reasons: (1) location close to New York City International Airports, which given their location in the Northeastern United States would be the closest and easiest U.S. airports for Mr. Hussain's family and friends to get to from England, and (2) FCI Allenwood is the only BOP-run low-security facility in the Northeast Region which houses an Institutional Hearing Program (IHP) on-site, which could facilitate the deportation process.[24]  An assignment to FCI Allenwood-Low increases the chances that Mr. Hussain would be able to settle the matter of deportation while he is serving any period of incarceration imposed, such that he might be able to avoid being detained in ICE custody after completion of his BOP prison sentence.

## VII.    SUMMARY

36.    In summary, if Mr. Hussain is sentenced to a term of incarceration and is immediately remanded to custody, he will likely undergo an arduous, lengthy, and scary journey to his designated facility.  If he is sentenced to a term of imprisonment, regardless of whether he is remanded, Mr. Hussain will be assigned to a prison beyond his security needs solely because he is a U.K. citizen.  He will be placed at unnecessary risk.  At a low-security assigned facility, he will be subjected to a more hostile environment and more unsanitary conditions than he would be subjected to in a minimum-security facility.  The daily personal stress of incarceration in a higher than necessary security level, especially within the privatized corrections environment with its substantially amplified hardships, will be palpable for Mr. Hussain, who is 54 years old and has never had any experience with criminal activity or spent any time in prison.  He may also serve a period significantly beyond his actual sentence in ICE custody as he awaits deportation (this

---

[24] See the list of IHP sites the American Immigration Lawyers Association received from a FOIA request to the DOJ's Executive Office for Immigration Review, available at https://www.aila.org/infonet/eoir-foia-response-provides-list-of-potential.

DECLARATION OF JOEL SICKLER IN SUPPORT OF SUSHOVAN HUSSAIN'S SENTENCING MEMORANDUM
Case No. 3:16-cr-00462-CRB

1310617

1    outcome may be avoided with a judicial recommendation that the BOP assign Mr. Hussain to FCI

2    Allenwood-Low).

3         37.    It is with good and honest intentions that the above information is presented to the

4    Court. I have spent over three decades involved in this type of work that has shown starkly the

5    realities of the prison system, particularly for someone in Mr. Hussain's position. I respectfully

6    urge the Court consider the information presented herein when imposing sentence on Mr.

7    Hussain.

8

9         I declare under penalty of perjury under the laws of the United States that the foregoing is

10   true and correct and that this declaration was executed on *November 20*, 2018, in

11   *Alexandria, VA*.

12

13

14                                        JOEL A. SICKLER, Criminologist
                                          *Justice Advocacy Group, LLC*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                   16
                    DECLARATION OF JOEL SICKLER IN SUPPORT OF SUSHOVAN HUSSAIN'S SENTENCING
                                                MEMORANDUM
                                         Case No. 3:16-cr-00462-CRB

1310617