Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

```
UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    VS.                         )       No. CR 18-009 WHA
                                )
AMIR BAKHTIARI,                 )
                                )
            Defendant.          )
_____)       San Francisco, California
                                         Tuesday, October 29, 2019
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

```
For Plaintiff:          DAVID L. ANDERSON
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                  BY:   BENJAMIN KINGSLEY
                        ASSISTANT UNITED STATES ATTORNEY


For Defendant:          BOERSCH & ILLOVSKY LLP
                        1611 Telegraph Avenue, Suite 806
                        Oakland, California 94612
                  BY:   MARTHA BOERSCH, ESQ.



Also Present:           Jill Spitalieri, U.S. Probation
                        Mr. Peter Sonnen




Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter
```

<u>**Tuesday - October 29, 2019**</u>                    <u>**2:01 p.m.**</u>

**P R O C E E D I N G S**

**---000---**

           **THE CLERK:**  Calling criminal action 18-009 and

criminal action 19-127, United States versus Amir Bakhtiari.

Counsel, please step forward and state your appearances for the

record.

           **MR. KINGSLEY:**  Good afternoon, Your Honor.  Ben

Kingsley for the United States.

           **THE COURT:**  Welcome.

           **MS. BOERSCH:**  Good afternoon, Your Honor.  Martha

Boersch for Mr. Bakhtiari, who is present.

           **THE COURT:**  Welcome to you.

       Mr. Bakhtiari, welcome to you.

           **MS. SPITALIERI:**  Good afternoon, Your Honor.  Jill

Spitalieri with U.S. Probation.

           **THE COURT:**  Okay.  We're here for sentencing.

       Mr. Bakhtiari, did you read the presentence report?

           **THE DEFENDANT:**  Yes.

           **THE COURT:**  You did.  Are there any unresolved

objections?

           **MS. BOERSCH:**  No, I don't think so, Your Honor.  I had

an objection to the restitution amount, but I think I've

resolved that.

           **THE COURT:**  Great.  How about by the Government?

1        **MR. KINGSLEY:**  No, Your Honor.

2        **THE COURT:**  Okay.  So this is a little complicated.

3   The guidelines, as calculated, are offense level 27, criminal

4   history number I; correct?  Which translates to 70 to 87 months

5   according to the guidelines.

6        The probation officer recommends 36 months on Count One

7   and 60 months on Count Two, concurrent, for a total of 60

8   months; right?

9        **MS. SPITALIERI:**  Yes, Your Honor.

10        **THE COURT:**  The Government recommends 70 months.

11        (Emergency alarm sounds.  Proceedings in recess from 2:03

12   p.m. to 2:25 p.m.)

13        **THE COURT:**  Please be seated.  Let's resume with

14   Mr. Bakhtiari's case.  I apologize for the interruption.  It

15   was a fire drill we knew about, but we didn't know it would be

16   continuous noise.  We were told we could go ahead with the

17   hearing.  Unfortunately, they didn't tell us the noise would

18   interfere.  Anyway, now it looks like it's all clear, so we

19   will continue.  To resummarize, the guideline range is 27-I,

20   which corresponds to 70 to 87 months.  PSR recommends 60, the

21   Government 70, defendant 36.

22        So we will now have argument and then elocution.

23        So, Ms. Boersch, you may go first.

24        **MS. BOERSCH:**  Thank you, Your Honor.

25        I recognize that we've asked for a significant variance

 1   from the recommended guideline range, but given Mr. Bakhtiari's

 2   immigration circumstances that are going to result in him

 3   serving a significantly harsher and longer sentence than a U.S.

 4   citizen defendant in his position, I think it's warranted.

 5   That along with his family situation and the fact that at the

 6   end of the day he's going to be deported to Iran, a country

 7   that he has not lived in for over 30 years.

 8        I want to talk about three things.  First is the

 9   collateral consequences of this conviction, quite apart from

10   any sentence of imprisonment.

11        The second is the disparity that would result if he were

12   to receive the sentences recommended by the Government or

13   Probation because of the fact of his immigration status.

14        And the third thing I want to address is the Government's

15   notion that a long sentence of imprisonment is necessary for

16   general deterrence.

17        As to the first point, the collateral consequences,

18   there's collateral consequences in every criminal case.  I

19   recognize that.  But I think they're severe here, and it's tied

20   up with his family circumstances and his immigration status.

21        He has -- this investigation started back in 2016, when

22   his employer started an internal investigation.  He was fired

23   from his job.  He lost his job.  He's been unemployed since.

24        The conviction alone will result in permanent loss of his

25   career and likely any chance that he'll be able to get a job or

1    much of a job in the future.

2         He's already lost his home.  The home has been sold.  The

3    portion that he owned of the equity has been turned over to the

4    government.  His family has lost any financial security because

5    he is or was the sole breadwinner and his wife was a

6    stay-at-home mother.

7         The most important thing to me is, given his immigration

8    circumstances he is going to lose the relationship with his

9    wife, perhaps permanently, and most importantly the

10   relationship he has with his two boys, 7-year-old and

11   4-year-old sons who he has been primarily caring for since

12   2016.  His deportation in Iran will essentially end his family

13   relationship.  They are citizens of the United States.  They do

14   not speak Farsi.

15        The State Department advises against travel to Iran.  And

16   so it's unlikely, if he's deported, which is likely, if he's

17   deported to Iran that he'll really ever be able to see his

18   family again because he won't be able to come back into the

19   United States.

20        In addition to that, because, again, of his immigration

21   status he faces essentially an indeterminate period of time in

22   custody because once he serves whatever term of imprisonment

23   this court imposes he will be placed into immigration custody,

24   into an ICE detention facility, for an indeterminate amount of

25   time, particularly because he's deportable to Iran, a country

1   with which we do not have diplomatic relationships.  So it's

2   much more difficult, it takes much longer to deport people in

3   that circumstance.  And I've cited to some authority for that

4   in my sentencing memo.  In addition to that, in addition to all

5   of that, he is obviously subject to some significant financial

6   penalties which he has already made an effort to try to repay.

7        And, finally, there's ongoing civil litigation against

8   both himself and his wife.  And his wife and family will have

9   to deal with that for however much longer that will have to go

10  on.

11       So those are enormous collateral consequences, putting

12  aside any term of imprisonment.  And I think those need to be

13  taken into account if the Court is considering that one of the

14  purposes of sentencing is to provide some sort of a general

15  deterrence.  And I think these collateral consequences

16  certainly do.

17       On the disparity, and I run through this in the sentencing

18  memo, but because he is a deportable alien he will not qualify

19  for a minimum security facility.  But for his immigration

20  status he would qualify for Lompoc or Taft except they've shut

21  down Taft.

22       As a result, he will be placed in at least a low security

23  facility.  Those, as I've explained in my sentencing memo, are

24  much more onerous places of imprisonment than a camp.

25       Besides that, because he's an illegal alien, given an

order of President Trump, and I think it was January of 2018,
President Trump has now ordered that all foreign citizen male
defendants be housed in for-profit prisons rather than BOP
facilities.

And there's been several studies that have shown,
including one in 2016 by the OIG, that for-profit prisons are
much worse places to be incarcerated.  The rate of security
incidences are much higher; there's significant safety issues
with food, with the nature of the conditions in those prisons.

So he's most likely to be put in a for-profit prison and
subject to much harsher conditions.

Because of his immigration status, he will not be eligible
for any of the early release programs that BOP offers to every
other white collar defendant.

He will not be eligible for release to an RRC.  He will
not be eligible for any of the First Step programs.  And he
will not be eligible for early release to home detention.

As a result of all that, he will be subject to at least a
period of detention of 22 months longer than any other citizen
defendant in his position with the same laws and the same
Sentencing Guidelines.

And that's because he also is not going to be eligible for
the good-time credits.  So that's ten months there and then
another 12 months, potentially, given the potential for someone
else for release to a halfway house or a home detention.

```
 1        And then finally, again, is the ICE detention following
 2   any term of imprisonment for this offense which can be, as I
 3   said, indeterminate.  And the ICE detention facilities, as
 4   numerous studies have shown, are deplorable and even worse than
 5   those in a for-profit prison.
 6        So because of that and because of his family circumstances
 7   and the collateral consequences, I think that a 36-month
 8   sentence is a fair sentence here, given the offense, given the
 9   guideline range, and given the fact that another defendant in
10   his position, who is not a foreign citizen, would ultimately
11   end up serving approximately that amount of time.
12        The Government has asked for a longer sentence relying
13   primarily on general deterrence.  But there's really no
14   empirical evidence that shows that a longer term of
15   imprisonment results in a greater degree of general deterrence.
16   Rather, it's the certainty of punishment that provides some
17   general deterrence to the public.
18        So the length of the term of imprisonment is not what
19   provides general deterrence.  And, in addition, as I mentioned
20   before, general deterrence, I think in this case, is adequately
21   served by all the collateral consequences that I've already
22   discussed.
23        So given the Court's and Congress's instruction to the
24   Court to impose a sentence that's sufficient but not greater
25   than necessary to fulfill the goals of sentencing, I think a
```

1    sentence of 36 months is more than adequate given this case and

2    the defendant's circumstances.

3           THE COURT:  How much of the embezzled money has been

4    paid back to the victim?

5           MS. BOERSCH:  None of it -- it's all in the custody of

6    the United States at the moment.  I think so far -- I was

7    talking to Mr. Kingsley about this.  There's enough money to

8    pay back the IRS.  But the IRS is second in line.  So if the

9    IRS is owed, I think, 1.2 million or something, that's how much

10   has been collected so far.

11          And, in addition, there's the forfeiture.  And the value

12   of the forfeited items is another several hundred thousand.  I

13   don't know exactly.

14          And I would note, to the extent --

15          THE COURT:  Is Mr. Bakhtiari going to try to avoid

16   being deported?  You make it sound like it's a sure thing.

17          MS. BOERSCH:  I think it is pretty much of a sure

18   thing.  And he doesn't know, at this point, whether or not -- I

19   don't think he can avoid it.  Whether he can try to challenge

20   it or not, we don't know yet.  I mean --

21          THE COURT:  Does he have an immigration lawyer?

22          MS. BOERSCH:  He did have one.  He's looking for

23   another one.

24          THE COURT:  You say he would go into ICE detention,

25   but I see cases all the time where the deportee is out on bail

1    pending many years of immigration court proceedings.  So is it

2    a certainty that he'll be in custody, or is that unknown?

3          **MS. BOERSCH:**  It's unknown, I think.  But it's a

4    significant risk, particularly given that he's deportable to

5    Iran.

6          **THE COURT:**  Okay.  Mr. Kingsley.

7          **MR. KINGSLEY:**  Your Honor, Peter Sonnen, who is one of

8    the owners of Sonnen Motorcars is here.

9          **THE COURT:**  Where is he?

10         **MR. KINGSLEY:**  He is sitting in the front row.

11      Would the Court like him to speak now or after?

12         **THE COURT:**  Let's have his statement now, and you get

13   to follow it, and then I'll give Counsel another opportunity to

14   reply to that.

15      Let's have him speak now.

16         **MR. KINGSLEY:**  Thank you.

17         **THE COURT:**  Welcome.  Please come up here to the

18   microphone and tell us what your name is.

19      Please, go ahead.

20         **MR. SONNEN:**  My name is Peter Sonnen.  I'm the

21   president and CEO from Sonnen Motorcars.  And I made a few

22   notes to tell you how I look the whole situation.  Very short.

23   I don't want to do too much.

24         **THE COURT:**  Go ahead, please.  Take your time.

25         **MR. SONNEN:**  Okay.  I thank you for allowing me to

1   speak up here what I experience, what I am saying, and provide

2   a brief statement.

3        I thank the U.S. Attorney, the DOJ, and the IRS attorneys

4   and staff for pursuing and investigating Bakhtiari's wrongdoing

5   and bringing him to justice.

6        It is hard to put it in words or describe how this whole

7   ordeal has affected myself, my family, and the people I've

8   worked with on a daily basis other than to say it has been

9   devastating.  I trusted Bakhtiari, and he not only violated

10  that trust in every way, shape and form, his conduct was

11  manipulative, threatening, calculated, and despicable.

12       This was not an isolated event.  It took place over an

13  extended period of time and involved many players and resulted

14  in the theft of millions of dollars from me and my business.

15       I will never recover from this, ever.  In short, the man

16  is evil.  And I respectfully request that Your Honor sentence

17  him to the maximum time under the guidelines.  He deserves

18  significant jail time.

19       He should know that I will continue our effort to seek

20  full restitution from him of the millions he has stolen, with

21  the aid of his cohort in crime until I can recover every cent.

22       Your Honor, that's my victim impact statement.  Thank you

23  for considering it.

24       The last important thing I would like to mention is that

25  let's not forget for one moment that this man is capable of --

1    what this man is capable of, and that Bakhtiari used threats,

2    fear, and intimidation of my employees in order to achieve his

3    purposes.  That disturbs me deeply that good people who I

4    employed were treated in such a manner.

5        Let's not provide him with a full opportunity to ever do

6    this again.  Put him away, please.  This guy was so bad he

7    threatened my employees.  He thought he was part owner of my

8    dealership.  If he say one word, he fired them right away.  And

9    people were afraid to say anything.

10       I was surprised that that could be happen, that people not

11   come to me because they had to go relationship with them and

12   tell them what bothers them.  And people disappeared, and I

13   didn't know it.

14       And one of my top manager, he quit.  And he came later

15   back with his wife to me and said, "I'm very sorry, but I could

16   not stand it anymore, and I was afraid about this guy."  So his

17   main tool were fear and threatening.

18       And, also, he hurt my image.  I have neighbor right next

19   to me.  The owner came to me, sent me a letter and said,

20   "Mr. Sonnen, this is unheard of how your general manager

21   behaves."  She has fiance, and he treated him, she said, like

22   dirt.  And he expect from me payment to him for making that up.

23   I pay the guy $10,000 to eliminate that.  Bakhtiari didn't care

24   about it.  I told him that he even doesn't want to talk about

25   it.

1          It is a guy he has a character that is so black and so

2     deep.  In my 60 years, almost, as a businessman -- I had

3     business in Germany that was not small and had business here

4     and never met a guy like Bakhtiari.  He is dangerous.  The guy

5     is really, really dangerous in business.

6          If the guy went to war, I would not be in his Army, you

7     know.  It's bad.  It's really, really bad.  I'm sorry to say

8     it, but it's the truth.

9          Thank you very much for my time.  I appreciate that.

10          I could tell you many stories.  Afterwards came people and

11     told me stories about him.  I mean, what I tell you is the

12     thing is really heavy.  He can destroy a company.  He can

13     destroy your image.  He can do so much harm to a business and

14     specifically car business.  That's really bad.

15          Thank you.

16          **THE COURT:**  Thank you, sir.

17          Mr. Kingsley.

18          **MR. KINGSLEY:**  Thank you, Your Honor.

19          I just want to go back a little bit to the offense for a

20     moment.  I think the Court is very familiar with it.  I want to

21     point out -- and Ms. Boersch is an excellent lawyer, and I know

22     why she did it -- spent almost no time talking about what

23     Mr. Bakhtiari did, none whatsoever, and almost nothing about

24     him personally, and instead his family and his immigration

25     status.

 1          And the reason for that is because the crime here is

 2    unexplainable.  It's about the worst type of white collar crime

 3    you can commit.  It's lying to people's faces for years in

 4    order to steal money to fund a lavish lifestyle.  And there's

 5    nothing about him personally or the way he committed this

 6    offense or his motives for it that add up to a mitigating

 7    factor.

 8          I think the Court heard from Mr. Sonnen and can see from

 9    the victim impact statement but also from the other cases in

10    front of the defendant and the broad fact pattern how

11    Mr. Bakhtiari sucked all of these other people into his scheme,

12    whether they were codefendants in this case, because the

13    Government can prove that they knew what was going on, or they

14    didn't know for whatever reason.

15          This was a long thing that involved lying and manipulating

16    a lot of people for a really long time.  And it's really bad.

17    And 36 months is far too low for something like that.

18          I want to talk a little bit about the collateral

19    consequences that Ms. Boersch has pointed to with the broad

20    point that those are really his fault.  He knew that he had a

21    small family when he was doing this.  He didn't steal the money

22    to feed his kids.  He stole it, you know, to go to Vegas and

23    spend money on himself mostly.  And he knew the risk that, as

24    he was doing this, that he would go to jail and never see his

25    kids while he was in jail or that he would be deported.

1       It's hard to sit here today and listen to an argument by

2   somebody who knew all of those things while this was happening

3   and now asks for a substantial reduction in the sentence

4   because of something that was fully within his power for the

5   last seven years.  This isn't some unexpected circumstance.

6       And I sympathize with his family, but they're his victims

7   more than they are anything else.  And it's his fault that this

8   is happening to them.

9       With respect to deportation, I agree with the Court

10  entirely that that is a completely uncertain process.

11      Ms. Boersch's sentencing memo lays out facts that a good

12  immigration lawyer could presumably spin into an asylum or

13  withholding of removal claim or possibly a convention against

14  torture claim.

15      I don't know.  I'm not an immigration attorney.  But I

16  don't think anybody sitting here today can predict whether he's

17  going to go into ICE custody and whether he will necessarily be

18  deported.

19      And if he has a good claim, he should make that claim.

20  Given his family's relationship to the government of the Shaw,

21  maybe he shouldn't go back to Persia.  That's -- or to Iran.

22  That's an immigration issue that has nothing to do with what's

23  before this court, and I don't think the Court can assess it on

24  this record in a way that allows the Court to take it into

25  account.

1        There's also a bit of an inconsistency there, in the

2   argument that he needs to see his family and so he should get a

3   shorter prison sentence, but then once he's out he's

4   immediately going to go into ICE custody and get deported

5   anyway.

6        I don't know how the Court is supposed to weigh those

7   things, and I don't really think the immigration status cuts in

8   favor of a shorter sentence for that reason.

9        On the type of custody, I think we are -- it is a black

10  hole for this court to try to sentence people based on

11  predictions on the sort of hardness or quality of the time that

12  they're going to serve at sentencing.

13       BOP needs to have the ability to make classifications

14  based on all types of factors, and it does so.  But I don't

15  know why the Court -- why it would be appropriate for the Court

16  to consider it just in this case and not in literally every

17  single other case where there's some ability to guess at what

18  type of designation somebody is going to have and take that

19  into account.

20       I don't think we can reliably do that in every case.  I

21  don't think 3553 tells the Court to do that.  And I think it

22  results in a set of arbitrary distinctions at sentencing.

23       I'm not sure why it would be the case that because

24  Mr. Bakhtiari is deportable he should get half the sentence of

25  an American citizen who is presumably not going to go to a low

1  security facility, is going to go to a minimum security

2  facility instead.  We just don't know what's going to happen.

3      For general deterrence, I think -- I know this court has

4  said it before.  It is by far the most important factor, but

5  it's not the only factor here.

6      I think there is a significant aspect in a case like this

7  that needs to simply take into account the pathological conduct

8  of a defendant.  The way the defendant committed his crime, the

9  length of time that he committed his crime, and the reasons he

10 it did, and the impact on the victim.  Those are things that

11 matter at sentencing.  Those don't go to general deterrence,

12 and they're relevant.

13     I do think general deterrence is extraordinarily

14 important.  I think there's a lot of people in this world that

15 would take $7 million in exchange for 36 months in a federal

16 prison.  I don't know.  It doesn't seem like nearly enough time

17 to deter that amount of misconduct.

18         **THE COURT:**  What do you think happened to all that

19 money?

20         **MR. KINGSLEY:**  I think Mr. Bakhtiari -- well, we've

21 recovered some of it.  I think he spent a lot of it.

22     I've seen the American Express card statement that Austin

23 Caba paid with embezzled funds, and it's just day-to-day lavish

24 living.  Clothes, personal -- you know, hand bags, watches,

25 expensive artwork, restaurants, travel.

1    In my experience, most white collar defendants spend their

2 money as it comes in.  And I don't think Mr. Bakhtiari is that

3 different except that he also was being paid over $300,000 a

4 year by Mr. Sonnen and was able to save some of it in IRAs for

5 his family members or put the money into his house.  But he

6 spent it on the sort of stuff that white collar defendants

7 often spend their money on.

8        **THE COURT:**  Have the other defendants been sentenced?

9 I can't remember.

10       **MR. KINGSLEY:**  No.  The other two defendants are

11 cooperating, and they have not been sentenced yet.

12   And I should say, in the Government's view, they are both

13 considerably less culpable than Mr. Bakhtiari, both in terms of

14 their role.

15   He was the mastermind of this operation, and they were

16 brought in for periods of time for a portion of it and

17 benefited such a small amount compared to the amount that he

18 benefited in the scheme.

19       **THE COURT:**  Let me ask you, Probation.  Normally, this

20 would be a -- in addition to prison time, a fine.  But you

21 recommend no fine, and yet he has retained counsel.  And he

22 embezzled, by his own admission, many millions.  So are you

23 sure he hasn't got the money to pay a fine?

24       **MS. SPITALIERI:**  Your Honor, like he said, the money

25 that he took in, it does appear that he just spent it as he

1    took it in.

2         And Probation weighs the restitution as a priority.  So we

3    wanted that to get paid back quickly.  And then after the

4    $8 million is paid back, there's probably -- if it gets paid

5    back, there won't be much left.

6         Because, like she said, he will probably eventually get

7    deported, he's not going to have a job, and we just held the

8    restitution to be a priority.

9              **MR. KINGSLEY:**  Your Honor, I think the Government --

10   Mr. Bakhtiari has worked with the Government through his

11   counsel to deal with his assets.  And I think it's an important

12   part of this case.

13        And that is one of the reasons I'm asking for the low end

14   of the guidelines, is that we worked out an agreement to

15   basically, for his assets, what he has left in his name and not

16   his family's assets, sign them over to the Government for use

17   in restitution.

18             **THE COURT:**  The restitution goes to who?

19             **MR. KINGSLEY:**  It's going to go to Sonnen Motorcars.

20             **THE COURT:**  First?

21             **MR. KINGSLEY:**  First, entirely, because the Sonnen

22   Motorcars restitution number is more than I expect

23   Mr. Bakhtiari would ever pay.  So I don't -- the IRS is never

24   going to get paid by Mr. Bakhtiari.

25             **THE COURT:**  So how much of restitution money is there

1    already?

2         **MR. KINGSLEY:**  I think Ms. Boersch is about right,

3    1.2 million, 1.3 million approximately.  There's a bunch of

4    individual items that will need to be auctioned off, like

5    watches and artwork, but that's of 6.8 -- 6.5, 6.8 million,

6    6.6 million in Sonnen Motorcars' restitution amount.

7         **THE COURT:**  What is the nationality of Mr. Sonnen?

8         **MR. KINGSLEY:**  Mr. Sonnen is from Germany.

9         **THE COURT:**  All right.  So there was no family

10   relationship there?

11        **MR. KINGSLEY:**  No.

12        **THE COURT:**  All right.  Okay.

13      Ms. Boersch, you should have an opportunity to respond to

14   what the victim said and, if you wish, to what Mr. Kingsley

15   said.

16        **MS. BOERSCH:**  Thank you, Your Honor.

17      With respect to the offense conduct, I do want to respond

18   briefly to that.  I didn't address it because he has pled

19   guilty.  He admitted to the facts that are in the presentence

20   report.  We don't dispute those.  And what he did is undeniably

21   bad.  I don't think it's -- I think there's many other white

22   collar cases where there's this sort of conduct.  But it's

23   undeniably bad.  We don't dispute it.  He pled guilty.  He

24   accepted responsibility for it.  And, clearly, it was motivated

25   by greed.

1    So from my perspective, that's all a given.  And the

2    question now is, what is a sentence that's sufficient but not

3    greater than necessary to deal with this offense given all of

4    the circumstances here?

5    And it's not just that he'll be deported at the end of

6    this.  It's that the conditions of his confinement are going to

7    be longer and worse than another defendant.

8    This is not the first court that has faced this issue.

9    Judge Breyer faced the same issue in the *Hussain* case, and

10   granted a significant downward variance, as a result, from 144

11   months down to 60 months, because that defendant, who was a UK

12   citizen, was subject to all of these problems.

13   And just last week Judge Colleen McMahon, in the Southern

14   District of New York, granted a fairly significant downward

15   departure -- downward variance for Conrad Black in the Libor

16   trading case for the exact same reasons.  And before she

17   imposed sentence --

18        **THE COURT:**  What, again, is the reason that he will

19   not get a camp?

20        **MS. BOERSCH:**  Because of the BOP regulations that

21   specify that no -- anybody who's a noncitizen must be housed in

22   at least a low security facility and not a minimum security

23   facility.

24   But for that he would be, under the BOP table where you

25   calculate someone's points, he would be eligible for a camp.

1   That's in my sentencing memo.  He has essentially zero points

2   or one or two points.  So that automatically takes him out of

3   the camp territory.

4        So it's those issues that make this case different.  And

5   it's those issues that both Judge Breyer and Judge McMahon

6   thought created significant disparity between the sentences

7   that the defendants in those cases or here would face compared

8   to a defendant who was a citizen of the United States.

9        So I'm not --

10       **THE COURT:**  Did Judge Breyer put the downward

11   departure solely on that ground?

12       **MS. BOERSCH:**  I believe it was solely if not primarily

13   on that ground.

14       **THE COURT:**  Is that right?

15       **MS. BOERSCH:**  I mean, he had a lot -- Mr. Hussain had

16   a lot of other --

17       **MR. KINGSLEY:**  I don't think that was the only ground

18   for the variance.  But I haven't reviewed the sentencing

19   transcript, so I don't want to speculate on it.

20       **THE COURT:**  He went from 144 to what?

21       **MS. BOERSCH:**  Five years.

22       **MR. KINGSLEY:**  And the Court will recall that was an

23   accounting fraud case with a totally different set of facts

24   than an embezzlement case where the defendant is embezzling

25   directly from a person.

1          **MS. BOERSCH:**  You know, I just -- I don't know if the

2    Court remembers, but you had another case that's not too

3    dissimilar from this, where the Court imposed a 14-month

4    sentence on Larry Goldfarb, who was a

5    6-and-a-half-million-dollar fraud.  Same thing.  He was

6    embezzling from his fund.  There was a parallel SEC civil

7    proceeding.  And at the end of the day, he had -- he was a U.S.

8    citizen, but he had other mitigating factors and received a

9    14-month sentence and is now out and doing fine.

10         So my point is simply that the immigration issues related

11   to Mr. Bakhtiari and other defendants like Mr. Hussain create a

12   situation in which they're necessarily going to do a longer and

13   harsher sentence than someone else in their position who's a

14   U.S. citizen.

15         And I think the Court has to take that into account.  And

16   I think I've done that in my sentencing memo.

17         **THE COURT:**  Wait.  Is it true that he will not get

18   credit for good time served?

19         **MR. KINGSLEY:**  I don't know if that's true, but I take

20   Ms. Boersch on her word on that.

21         **THE COURT:**  Does Probation know?

22         **MS. SPITALIERI:**  I believe he gets credit, but not in

23   the way that a citizen would.  So he would get the credit and

24   go into ICE custody.

25         **MR. KINGSLEY:**  So if he went into ICE custody --

1          **MS. SPITALIERI:**  It's at the 80 percent marker.

2   That's my understanding.  So it would still be custody, but I'm

3   not a hundred percent certain on that.

4          **THE COURT:**  Ms. Boersch, what do you say is the

5   situation?  What is the exact rule on credit for time served?

6          **MS. BOERSCH:**  You know, that was -- let me look,

7   because I cannot remember now.

8          **MS. SPITALIERI:**  And then my understanding is that ICE

9   custody is unknown.  He could be released, as you said, for

10  years with just having to report to ICE every few months or

11  annually, or he could be held for an indeterminate amount of

12  time.

13         **MS. BOERSCH:**  And, Your Honor, I don't recall, it was

14  in the -- Exhibit E, which was attached to my sentencing memo,

15  was a declaration filed in the Hussain matter.  I just don't

16  recall.

17         **MR. KINGSLEY:**  I think, Your Honor -- I mean, I think

18  this is part of the reason why this is such a dangerous road to

19  go down.  Every single defendant can second-guess BOP's reasons

20  for classifying them in a particular way.

21     I have had cases in front of this court with white collar

22  defendants who were not low-level designations and did not get

23  sent to camps.  That happens all the time.

24     And for the Court to sit here and try to figure out

25  whether what BOP is doing warrants a variance, because it's not

```
 1   really something that you take into account under 3553, I don't
 2   know how we do that.
 3          THE COURT:  Judge Breyer is famous.  He's on the
 4   Sentencing Commission.  He ought to know better than the rest
 5   of us what the -- what the right thing to do is.
 6          What do you say to that Hussain case?
 7          MR. KINGSLEY:  I think that we would have to sit down
 8   and look at the records in that case to figure out the
 9   individual circumstances of that defendant, of his crime, of
10   the comparable sentences for people who commit accounting
11   fraud, and weigh it in that way.
12          I think it's very dangerous for any of us to sit here and
13   look at totally different defendants on totally different cases
14   and try to figure out whether that's a fair comparison.
15          I also think -- I mean, our office vigorously opposed that
16   particular argument in that case, and I think Judge Breyer was
17   wrong to the extent he considered it.
18          The defendant does not have a right to go to a camp.  And
19   one of the main criticisms of the justice system is that white
20   collar defendants are given slaps on the wrists and sent to
21   camps.  He doesn't have a right to it.
22          MS. BOERSCH:  So --
23          THE COURT:  Tell me more about his mental condition
24   and Alzheimers and that.  I read that in your paperwork, but
25   you didn't mention it this time.
```

1            **MS. BOERSCH:**  That is one of the factors, Your Honor.

2       And Mr. Bakhtiari has been granted disability by the

3  Social Security Administration, and his driver's license has

4  been suspended because of what -- it's not completely diagnosed

5  yet, but either early onset dementia or Alzheimers.  He's had

6  some significant mental issues.  I don't know if the Court

7  recalls, but we had to put off a change of plea several times

8  as a result.

9       He's currently in treatment.  He's undergoing some stem

10  cell replacement therapy, which is sort of new treatment,

11  potential treatment for it.  And that is ongoing.  That

12  treatment obviously he won't get in any Bureau of Prisons or

13  any other facility.  So that, I think, is another factor that

14  has to be considered.

15       But to get back to Mr. Kingsley's point that the Court

16  shouldn't be considering what BOP is doing, I disagree with

17  that.  I think under 3553 the Court has to consider what is

18  going to happen to this defendant.  And the question is, what

19  is an appropriate sentence for this defendant?

20       And as to his point that -- and this is not -- you know,

21  it's very clear, if you read my sentencing memo it's very clear

22  how this will work given his immigration status.

23       As to Mr. Kingsley' point, "Well, we can't be comparing

24  one defendant to another," well, we do that all the time.

25  That's the whole point of looking to see if the sentence is

1   disparate or not.  So you have to.

2        And then the final point I want to make, and this is a

3   philosophical point, but if you look at the sentences over the

4   last 20 or 30 years, the length of the terms of imprisonment

5   have gone up dramatically.

6        And we're at a point that because of the guidelines, the

7   fraud guidelines in particular, we seem to be sending everybody

8   to prison for six or seven years.  First time offenders, who

9   have never done anything before in their lives, who since the

10  offense have not done anything wrong.

11       And I really question the wisdom of that to begin with.

12       **THE COURT:**  No, no.  At least in this courtroom most

13  of the sentences are much less than that.  Some of them are

14  that high, that's true, but not a majority.

15       **MS. BOERSCH:**  I appreciate that, Your Honor.  And I

16  have had several cases in front of you where that was true.

17  And I think that's absolutely the right approach, particularly

18  now that the guidelines are not mandatory.

19       And as to Mr. Bakhtiari's character, I mean, he has been

20  very quiet here because he knows this was a bad offense and he

21  accepts responsibility for it.  And he feels badly about it.

22  But if you read the character reference letters, he's a

23  generous man and he's a loving family man.  Did he commit a bad

24  crime?  Yes, he did.  Did he suffer from a serious lapse of

25  judgment that extended for a long period of time?  Yes, he did.

1        But, at the end of the day, does he really need to spend

2    70 months in jail and then be deported to Iran for an offense

3    that is not that atypical from many of the offenses that -- in

4    this building, many other sort of white collar offenses?

5        And I appreciate the Court has a very difficult job.  It

6    is a very difficult job.  But that's, at the end of the day,

7    what has to be decided.

8        And I just ask for the Court to consider the disparate

9    effect that a term of imprisonment is going to have on

10   Mr. Bakhtiari and the effect that his immigration status is

11   going to have on his family, particularly his two young boys.

12       I can't -- separating a father from the two young boys --

13   and as to the Government's point that, well, he knew that

14   before he committed the offense, you can say that in every

15   single case about every single mitigating circumstance.  So

16   that's just, in my view, not an answer.  Because if that were

17   true, if you always said that, you would never apply a

18   mitigating factor because in every case you could say, well,

19   the defendant knew that; he should have thought of that before

20   he committed the crime.

21       The crime is done.  He's pled guilty.  He's accepted

22   responsibility.  The question now is, what's an appropriate

23   sentence under all the circumstances?

24       And I submit that the recommendation that I'm making of 36

25   months is sufficient but not greater than necessary to achieve

1    the goals of sentencing and for him to be able to try to pay

2    some more restitution.

3         THE COURT:  All right.  Mr. Bakhtiari, you have the

4    right to say whatever you would like to say before the Court

5    makes a decision.

6         Please, go ahead.  Please.

7         THE DEFENDANT:  Thank you.

8         MS. BOERSCH:  Do you want to say something to the

9    Court?  Go ahead.  Do you want to?

10

11         (The defendant conferred with counsel off the record.)

12         MS. BOERSCH:  Do you want to say something or not?

13    No.  I think he's not.

14         THE COURT:  All right.  Thank you.

15         All right.  The answer is 54 months in custody followed by

16    three years of supervised release.

17         The reason for the departure are largely the reasons given

18    by Ms. Boersch, though, I want to say I think I agree with

19    Mr. Kingsley that it's not disparity because the BOP will send

20    someone to a tougher camp or tougher facility than they would a

21    U.S. citizen.  The BOP has its own guidelines for presumably

22    good reasons.  And those reasons account for the disparity, so

23    it's not a disparity to -- for the BOP to take that into

24    account.

25         Nevertheless, other reasons given by Ms. Boersch, mainly

1    his mental condition and medical condition, as well as the fact

2    that he has made some restitution and in significant amounts,

3    those, in my mind, warrant special consideration.

4        I do think 54 months will be the minimum time that is

5    needed to satisfy the statutory sentencing factors.

6        This was a particularly egregious crime that lasted many

7    years, a horrendous breach of trust.  It wasn't a one-time

8    event.  It wasn't even a five- or six-time event.  It was many

9    years of cheating, betraying his employer for no good reason.

10   Not even to feed his family.  It was for a lavish lifestyle.

11   So Mr. Kingsley is right, the facts of this case are

12   horrendous.

13       With respect to immigration consequences, the best you can

14   say is maybe he will be deported and maybe he will be detained

15   in custody.  But we don't know that for sure.  And a lot can

16   happen between now and the time he comes out of the BOP.  So a

17   little bit of the downward departure is based upon that, but

18   it's speculation.

19       And I'm sure Mr. Bakhtiari will get a good immigration

20   lawyer and figure a way to stay in this country for decades

21   using the same arguments we've heard today.

22       Pursuant to the Sentencing Reform Act, it's the judgment

23   of the Court that Amir Bakhtiari is hereby committed to the

24   custody of the Bureau of Prisons for a term of 54 months.  This

25   consists of 36 months on Count One and 54 months on Count Two,

1    all concurrent.

2        Upon release, he will be on supervised release for three

3    years.  This is one year on Count One and three on Count Two,

4    all concurrent.

5        Within 72 hours he must report -- within 72 hours of

6    release from the custody of the Bureau of Prisons, the

7    defendant shall report in person to the Probation Office in the

8    district to which he is released.

9        While on supervised release he shall not commit any

10   federal, state, or local crime, shall comply with the standard

11   conditions adopted by the Court except that mandatory drug

12   sentencing is suspended.

13       Here are additional conditions.  You must comply with all

14   of the Immigration and Customs Enforcement regulations, and if

15   you are deported not re-enter the USA without the express

16   consent of the Secretary of Homeland Security.

17       You must not have a fiduciary capacity position without

18   prior permission of Probation.

19       You must pay restitution and special assessment imposed by

20   the judgment.

21       You must comply with and cooperate with the IRS in a

22   good-faith effort to pay outstanding tax liability.

23       You must provide the U.S. Probation Office with a copy of

24   any written and approved agreement with the IRS for the payment

25   of any outstanding tax liability, to include penalty and

1   interest, within ten days of execution of such agreement.

2       You must not have any lines of credit without the approval
3   of Probation.

4       You must provide Probation with access to all financial
5   information they request, including tax returns.

6       You must submit your person, residence, office, vehicle,
7   electronic devices and their data, including cell phones,
8   computers, and electronic storage media or any other property
9   under your control to a search, to be conducted by U.S.
10  Probation or any law enforcement officer of any type, at any
11  time, with or without suspicion.

12      You must not have any contact with any codefendant in this
13  case.

14      You must cooperate in the collection of DNA as directed by
15  Probation.

16      Unless directed in writing otherwise, you must check your
17  voice mail and answering machine every day and follow all
18  instructions left by Probation.

19      You must not own or possess any firearms, ammunition,
20  destructive devices, or other dangerous weapons and must not be
21  present in a vehicle where you know any such thing is present.

22      It is further ordered that defendant pay to the United
23  States a special assessment of $200.

24      The Court finds the defendant does not have the ability to
25  pay a fine, so that part is waived.

1        It is further ordered that defendant pay restitution

2    totaling $8,062,550 to the victims in this case.   Namely, IRS,

3    1.44 million, Sonnen Motorcars 6.61 million; total

4    8.062 million.

5        Any reason why the form of -- oh, all of the matters that

6    are listed in the PSR, very long list, all of those are deemed

7    forfeited.   Agreed?

8            MR. KINGSLEY:  Except for the house, which has already

9    been sold.

10           THE COURT:  Agreed, Ms. Boersch?

11           MS. BOERSCH:  Agreed, yes.  And on the restitution I

12   think it should be joint and several with the other

13   codefendants.

14           THE COURT:  Is that correct?

15           MR. KINGSLEY:  I think that's generally true.

16           THE COURT:  All right.  So ordered.

17       And then any other reason why the form of judgment should

18   not be entered as stated?

19           MR. KINGSLEY:  No, Your Honor.

20           MS. BOERSCH:  No, Your Honor.

21           THE COURT:  Ordered.

22       Is there a plea agreement in this case?

23           MR. KINGSLEY:  There is.

24           THE COURT:  All right.  Well, I'll advise you, you

25   have 14 days to appeal from the entry of judgment, but you

```
 1   waived your rights of appeal.  I give you that advisement just
 2   for the record.
 3        All right, Ms. Boersch.
 4        MS. BOERSCH:  I'd ask for a self-surrender date in
 5   January so he can spend the time with his family over the
 6   holidays.
 7        THE COURT:  Any objection?
 8        MR. KINGSLEY:  No, Your Honor.
 9        THE COURT:  All right.  Let's give you a date.
10        How about January 6, 20th floor here or to whatever
11   facility he is designated.
12        MS. BOERSCH:  I would ask for a recommendation to
13   Lompoc.
14        THE COURT:  Is that one of those camps you said he
15   wouldn't go to?
16        MS. BOERSCH:  There's a low security facility there.
17   It's near --
18        THE COURT:  All right.  I will recommend Lompoc.  He
19   will either report to wherever he's designated or to the 20th
20   floor of this building on January 6th, by noon.
21        MS. BOERSCH:  His younger son's birthday is
22   January 10, so could he self-surrender on January 11th?
23        THE COURT:  No, that's too far out.  I'm sorry.  At
24   some point we've got to let the wheels of justice -- that's too
25   far out.  All right.
```

1          **MR. KINGSLEY:**  Your Honor, one other thing that's in

2     the judgment is, as part of the agreement, defendant's bond

3     that he posted in this case gets applied to restitution.  It

4     will be ordered in the judgment, but I don't know if it needs

5     to be spoken on the record.

6          **MS. BOERSCH:**  That's fine.  We agree to that.

7       I assume the Government's going to agree to dismiss the

8     remaining --

9          **THE COURT:**  I'm confused on what you want me to do on

10    this.

11         **MR. KINGSLEY:**  Defendant posted a cash bond when he

12    was arrested.  As a part of the agreement of disposal of

13    assets, Mr. Bakhtiari agreed that that bond should be applied

14    to restitution.

15         **THE COURT:**  You both agree.  I order that happen.

16         **MR. KINGSLEY:**  As Ms. Boersch suggested, the

17    Government moves to dismiss all remaining charges in the

18    indictment.

19         **THE COURT:**  So ordered.

20         **MS. BOERSCH:**  Thank you, Your Honor.

21         **THE COURT:**  Good luck, Mr. Bakhtiari.

22       (At 9:40 a.m. the proceedings were adjourned.)

23                          - - - - -

24

25

1

2

3

4                      **<u>CERTIFICATE OF REPORTER</u>**

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    DATE: Wednesday, November 27, 2019

8

9

10

11    _____

12          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25